CLEAR FORK COAL COMPANY *et al. v.* ANCHOR COAL COMPANY

(No. 6926)

Submitted October 6, 1931. Decided October 27, 1931.

*Payne, Minor & Bouchelle, W. H. File* and *W. E. R. Byrne,* for plaintiffs in error.

*Brown, Jackson & Knight, MacCorkle, Clark & MacCorkle* and *J. H. McGinnis,* for defendant in error.

LIVELY, JUDGE:

Anchor Coal Company prosecutes error to a judgment of the circuit court of Raleigh County, entered March 17, 1930, on a verdict in favor of plaintiffs in an action of ejectment in which about thirty acres of coal land was in dispute. The parties have coal lease deeds from a common grantor, the Coal River Mining & Lumber Company, which, in the year 1909, owned in fee a tract of 5356 acres of coal lying in Raleigh and Boone Counties on the waters of Big Coal River. In that year, the grantor laid off its tract into five mining leases, and had map prepared showing division of the tract into proposed leases. Lease No. 1 was deeded to defendant by metes and bounds in December, 1909; lease No. 4 was, on March 1, 1910, deeded to plaintiff, Clear Fork Coal Company, by metes and bounds, which subleased the portion in controversy to plaintiff, Leevale Coal Company, on June 28, 1919. Leases 2 and 3 were deeded to Seng Creek Coal Company in 1911, and on February 22, 1913, a portion of lease No. 2, containing 404 acres, was deeded to Anchor Coal Company. The location of a dividing line between lease No. 4 and No. 2 where that portion of lease No. 2 is now owned by defendant, Anchor Coal Company, is the basis of the controversy.

It appears that when Coal River Mining & Lumber Company divided its large tract into leases, it sent surveyor Venable on the ground with instructions to make the leases between the water courses as far as practicable, and lease No. 4 was laid off between the waters of Big Coal River and Clear Fork of Coal River on the west, Rockhouse Creek of Clear Fork on the south to mouth of Lick Fork (7250 feet from its mouth) and Tom's Branch on the north from a ''small fork'' thereof to its confluence with Big Coal. A map of the land embraced in lease No. 4 was made a part of the deed therefor and recorded therewith, and a photostatic copy here inserted will aid in visualizing the controversy. (See page 222.)

Surveyor Venable followed the water courses from D (mouth of Tom's Branch) to Lick Fork of Rockhouse Creek, 7250 feet from its mouth, giving distances but not courses until he reached that point (which is described as a corner to lease No. 1) from which corner he laid down the lines on the map: ''Thence N. 23° W. 3900 feet to corner of No. 2 lease; thence with line of No. 2 lease S. 45° W. 2350 feet to small fork of Tom's Branch'', from which point he followed Tom's Branch (a line of No. 2 lease) 4500 feet, thence with Tom's Branch, a line of lease 3 to the beginning at D on the map, at the mouth of Tom's Branch, the lease containing 1350 acres. The length of the 3900 feet line from the mouth of Lick Fork of Rockhouse to N. 23° W. to a corner of No. 2 lease is controverted by defendant. It says that line is in fact shorter by 720 feet. In other words, that the corner of lease No. 1 and No. 2 on that line is in fact 720 feet closer to the junction of Lick Fork with Rockhouse Creek. The court instructed the jury that if they believed that the mouth of Lick Fork of Rockhouse Creek is a corner to lease 4 and is a point fixed in the deed to plaintiff and that the line running thence to the disputed territory is in no title papers pertinent to the lands in controversy, described by any natural object or objects; and that no natural object was fixed by the lessor or its grantees as the northern terminus of said line, then the jury, in fixing the extent and location of lease 4 as originally made by the lessor, should find that such line runs from the

mouth of Lick Fork N. 23° W. 3900 feet. Defendant asserts that this instruction, in the light of the testimony, was erroneous as ignoring the map.

Defendant disclaimed interest in the land described in plaintiffs' declaration, except such as was included in the metes and bounds (setting out the calls and distances) of the deed made to it by the Seng Creek Coal Company (owner of lease 2), dated February 22, 1913. The westerly line of lease No. 1 (not shown on the map herein, but on a larger map said to be practically the same as the Venable map, but not with the record and which is referred to in lease 4 as cornering at mouth of Lick Fork of Rockhouse), begins at an exterior line of the original tract of about 6,000 acres on Seng Creek 250 feet below the right hand fork of Seng Creek, "thence with the meanders thereof and 250 feet therefrom on the west side 4,200 feet *to a fork of said right hand fork,* thence S. 23° E. 5250 feet to the mouth of Lick Fork of Rockhouse Creek" (the corner designated in leases 4 and 1). Reversing that call, the line would begin at the mouth of Lick Fork of Rockhouse and run N. 23° W. 5250 feet to a fork of the right hand fork of Seng Creek; thence 4200 feet to a point 250 feet below the mouth of said right hand fork and on Seng Creek, making the total distance of that line 9450 feet. Measured on the ground, this line was found to be 9480 feet. Three thousand and nine hundred feet of this line is the westerly line of lease No. 4, the length of which from mouth of Lick Fork is in dispute. This lease (No. 1) was executed December 1, 1909. The next lease, No. 4, was executed March 1, 1910, just three months later. It will be noted at once, that the eastern line of lease 4 (in controversy) took up 3900 feet of this 9450 feet line between the two leases, and lease No. 1 took the remaining 5550 feet. The division of distance in this long line between the two leases is specific. But it will be observed that the deed to lease 4 describes the line running N. 23° W. 3900 feet to a corner of *No. 2 lease.* That lease (No. 2) had not yet been deeded. It was not executed until 1911, and when it was executed to Seng Creek Coal Company, predecessor of defendant, Anchor Coal Company, it calls, with

a map attached thereto and made a part thereof, for beginning on Seng Creek at corner of lease No. 1, and with west line of same up right hand fork of Seng Creek *4200 feet to a stake corner to lease 1*, thence with line of lease No. 1 S. 23° E. *about* 1350 feet to a corner of lease No. 4, and in line of lease No. 1; thence leaving lease No. 1 and running with northwest line of lease No. 4 *about* 2250 feet to Tom's Branch, as it meanders to corner of J. E. Barrett and Coal River Mining Company. There is another provision in this lease to No. 2, which says: "For more specific calls and courses for description of leases Nos. 2 and 3, reference is hereby made to that part of leases Nos. 1 and 4 down Coal River and up Seng Creek of the Coal River Mining & Lumber Company, is hereby referred to and make a part of this lease." It will be seen that the call of lease No. 2 running up right hand fork from Seng Creek 4200 feet, thence about 1350 feet to the corner of lease No. 4 takes up 5550 feet of the long line of 9450 feet between the mouth of Lick Fork of Rockhouse and Seng Creek, leaving 3900 feet to lease No. 4. The calls and distances, respecting the line in controversy, in leases 2 and 4 agree. There is no discrepancy in the distances on this line between the two leases. They are exactly in accord. How then does defendant lengthened its line from Seng Creek more than 5550 feet and fix the corner between it and lease No. 4, 720 feet further south and nearer to the corner at the mouth of Lick Fork and Rockhouse? On February 17, 1913, Seng Creek Coal Company made its deed to defendant, Anchor Coal Company, for 404 acres of its lease No. 2, by metes and bounds, courses and distances, and it claims that this deed includes the 30 acres of coal in controversy. The calls of that deed begin at a corner of lease No. 1 on right hand fork of Rich (right) Hand Fork (of Seng Creek), thence with lease No. 1 S. 22° 15′ E. 1350 feet to a stake, corner to lease No. 4, thence with line of said lease No. 4 S. 54° 10′ W. 2325 feet to a birch in Tom's Branch near the head, thence by various calls to a stake in Tom's Branch, thence leaving Tom's Branch and the line of lease 2 and 4 northwest and by various calls, unimportant here, back to beginning corner. About the

time it purchased this 404 acres, Anchor Coal Company (defendant) employed C. B. Holsclaw to survey its purchase, or contemplated purchase. Holsclaw thinks he made the survey prior to the purchase. The result of his survey shortened plaintiffs' "3900 feet N. 23 West" from Lick Fork of Rockhouse 720 feet and caused this litigation. He began his survey at what he termed the *right hand fork of the right hand fork of Seng Creek* where he made a rock pile and iron wood corner, thence southeast with line of lease 1 (the long line) 1350 feet to a stake, corner to lease 4. This distance took him 720 feet beyond a point 3900 feet from the undisputed corned on Rockhouse, the end of the long line between leases 1 and 4. The distance from his beginning point at the rock pile and iron wood back northwardly to the beginning corner of lease 2 was 4990 feet instead of 4200 feet as stated in the lease deeds to Nos. 1 and 2. It is claimed by plaintiff that Holsclaw started his survey of the 404 acres 790 feet further south on the long dividing line than the title papers warranted. Holsclaw, after taking up 720 feet of the 3900 feet line, made a corner there and then ran the course N. 45 E. 2350 feet called for in leases 4 and 2 (in lease 4 as 2350 feet, and in lease 2 *about* 2250 feet) which brought him beyond a right branch of Tom's Branch about 200 or more feet south of where this right hand fork and another small branch unite. Being of the opinion from the title papers that the true corner was where the two branches united, he shifted his line about 200 feet to the north to the junction of these two branches, where he marked a water birch as a pointer. There was no marked corner there. Thence he ran back to the corner he had made on the long dividing line 720 feet south of where plaintiff claims the true corner, marking the line. He did not reverse the call as shown on the leases to 4 and 2 and run the line thereby. He ran the line S. 54 10 W. 2325 feet to reach the corner he had made on the long line. His interpretation of the title papers called for a corner on the long line 720 feet south of that claimed by plaintiff. So, in order to get back to this corner, he ignored the courses and distances found in the title papers to both leases. Defendant

claims that Holsclaw's survey thus made fixed the corner between leases 2 and 4, 720 feet nearer the undisputed corner at the south end of that line, or at least it was a question for jury determination, and therefore the court erred in telling the jury that plaintiff was entitled to the length of its eastern line of 3900 feet.

Holsclaw did not disclose to either plaintiff or defendant that he had disregarded the calls and distances in their title papers; and in September or October of 1926, Morton, plaintiff's mine superintendent of Leevale, who was at the head of the mine near the 3900 feet property line, heard blasting which he thought was inside of the property line, caused an investigation and found that defendant had actually crossed that line, and asked it in writing to stop; the request was declined, defendant advising that it was not encroaching, and this suit was promptly begun. Soon after plaintiff Clear Fork obtained lease 4, it employed Wesley Scarber, a former county surveyor of Raleigh County, to survey its lease, and he ran on the calls as set out in the lease, surveyed and measured the distance from Lick Fork of the 3900 feet call N. 23 West to a stake, as set out in the lease and map accompanying it, thence according to both calls and map, he ran the course N. 45 E. 2350 poles which brought him to a small fork of Tom's Branch at 2240 feet, at which point he made a corner at a rock pile in which he placed a stake, thence to reach Tom's Branch (as the next call ran with Tom's Branch) he ran three courses a total distance of 300 or 400 feet to the forks of Tom's Branch. It will be observed that the lease calls for ''a small fork of Tom's Branch'' at a distance of 2350 feet S. 45 W. from the stake at the end of the 3900 feet line and a small fork of Tom's Branch was reached at 2240 feet. Later, Bonner, who qualified as an expert surveyor, ran the same courses and distances to the same corners. Bragg, a witness for plaintiff and an old resident of that community, said he was with Holsclaw when he made his first survey on the long line, and that he, Bragg, asked Holsclaw to point out the junctions of leases 2 and 4 on that line, which he did and which the witness says was at the point 3900 feet from

Lick Fork or at the corner claimed by plaintiff. He said he marked a small chestnut at that point; that the chestnut is now gone, but a stake is at that point. Holsclaw denied that he had done so. The jury was well warranted in rejecting the survey made by Holsclow of the 404 acres, as it was not made according to the title papers of any of the leases. When he left the long line at a point 760 feet south of the end of the 3900 feet part of it and went into the woods several hundred feet south of Tom's Branch, it was enough to warn him there was something radically wrong. His establishment of the birch corner at the forks of Tom's Branch was arbitrary, as none of the leases called for that point as a corner, and his course and distance from that point back to the corner he made on the long line 720 feet south of the distance called for in plaintiff's deed was arbitrary and not warranted by any of the title papers of any of the leases. This review of the calls and distances in the various leases, and what the surveyors did in running them out and establishing them on the ground is necessary for a discussion of the errors assigned.

Plaintiffs' instruction No. 5, the substance of which is given above, is assigned as error, because, it is argued, it ignores the map which constituted a part of the deed. If the map filed with and made a part of plaintiff's deed (photostatic copy of which is above) is the map referred to as ignored by the instruction, we find nothing in that map which would change, modify or make indefinite the calls and distances in the deed. The map and deed are in perfect accord as to the call and distance of this line to which the instruction refers. If the large map, designated as defendant's Exhibit 2 (not with the record, but which is said to be practically the same as defendant's Exhibit No. 9, which is with the record), is meant, again we perceive nothing which would change, modify or make indefinite the call and distance of the line dealt with in the instruction. As above set out, a mathematical calculation of the distance of that line as allocated between lease 2 and lease 4 confirms the distance of the 3900 feet from Lick Fork N. 23 W. The large map confirms the distances instead of destroying them, or casting doubt

thereon. A map referred to in a deed and made a part thereof is regarded as a part of it in fixing a boundary. And the boundaries, monuments, courses and distances laid down on such map are to be regarded as the true description of the land as if they were expressly recited in the deed. *Snooks* v. *Wingfield*, 52 W. Va. 441. In the instant case, the recitals in the deed and on the map, so far as this line is concerned, are in accord. In the absence of natural boundaries and natural corners, and where there are no fixed artificial corners, courses and distances set out in the deed will govern. The instruction contains a correct legal principle. But it is not criticised on that ground. It is said that it ignores the map, and takes from consideration of the jury the map referred to in the deed.

The second point of error is that the court erred in not instructing the jury to the effect that if they believe the location of the line by Holsclow from the forks of Tom's Branch to the corner made by him in the long line (S. 54° 1′ W. 2325 feet) was acquiesced in by plaintiff as the true division line between leases 4 and 2; then that plaintiff was estopped thereby from claiming title and possession to the disputed acreage. That contention is based on the following evidence: Holsclaw said he was employed by Anchor Coal Company to survey the 404 acres proposed to be sold to it by the Seng Creek Company, then the owner of lease 2, in 1913, about the time the deed was made (February 22, 1913), and after making survey as above detailed, he marked the line, S. 54° 1′ W. 2325 feet, from the forks of Tom's Branch to the corner fixed by him on the long line. A year or so after that surveying, he happened to be back at the mine on lease 4 and a Mr. Brannon or Braham (he was not sure of the name), asked him to show him the line he had thus marked, and he did so. He could not say what connection Brannon had with either of the plaintiff companies, but that he appeared to have some employment at the mine. Supplementing this testimony of notice to Brannon of the location of that line on the ground, a mine map of Leevale Company was introduced which had thereon a partially obliterated line which corresponded to the line he had thus marked, and that showed the mine workings

to have been located 45 feet therefrom for practically the whole distance of the line, and on the opposite of that line, there was written the words "Anchor Coal Co." However, this mine map has also delineated thereon the 3900 feet long line and from the north end of that line another line down to a branch of Tom's Branch, which lines enclose the disputed area in the mine map. No encroachments were made on or possession taken of the disputed territory by defendant until about October of 1926, when defendant began to mine on the disputed land, was notified by plaintiff to stop without effect, and this suit followed. Did the making of this mine map deprive plaintiff of its title and possession? We do not think the mine map was a disclaimer of title to the disputed territory, nor an acquiescence in the line run by Holsclaw or the corner made by him in the long line. There was no agreement between the two coal companies, express or implied, fixing that line as so located, nor did there appear to be a dispute between them as to its location. "When the statute of frauds requires a deed to pass title, it would be absurd to say that an unaccepted proposal, for compromise, or mere knowledge that one is cutting timber or sod on one's land, or claiming it, and he remains silent or does not sue, or even concedes by words the right of his adversary, his title is gone." This is a quotation from Brannon's opinion in *Wade* v. *McDougle*, 59 W. Va. 113, 123. And in *Gwynn* v. *Schwartz*, 32 W. Va. 487, it was held that to make an agreed boundary (if not written) there must not only be a finished agreement, but it must be carried into execution by the parties by full actual possession of the line. The simple delineation of a line on its mine map within the exterior lines of its land shown thereon is not sufficient to estop the owner from asserting title to the boundaries of his deed. On this meager evidence an estoppel could not be based, and there was no error in refusing to submit the question to the jury. Moreover, there is nothing in the record that defendant knew that such a mine map had been made, and, consequently, relied thereon as a disclaimer of title. Holsclaw seems to have seen such a map, but there is no evidence that he ever communicated its existence to defendant. It is not shown that plaintiff by the delineation

of this line or the location of its mining operations induced defendant to act thereon or spend money on the faith of it. When first the controcersy arose in 1926 and defendant was requested to desist in mining on the disputed land, it replied in writing that its lease lines had been carefully surveyed by reliable engineers, rechecked and found correct, and that it had not mined beyond its property lines.

The last assignment of error is the refusal to allow C. E. Krebs, an engineer, to answer a question as to how he would locate the disputed corners. His answer was vouched on the record to be: ''If I were permitted to locate this line having the point designated in the question, I would locate the county line, and from that county line I would extend the line N. 23 W. the distance it scales on the map from the county line, which, in this direction, is 240 feet and I would locate that as the northeast corner of lease No. 4. Then I would go to the forks of Tom's Branch and locate the other corner of this line, and run the line from the forks of Tom's Branch to the point 240 feet north of the county line, on the line extending N. 23° W.'' This witness would have located these corners quite differently from the method used by Holsclaw, Scarber and Bonner. The county line had never been located, except as being along a ridge in that vicinity, and its delineation on the map by defendant's witness, Venable, was a mere guess. He said he must have received information that it was at the top of a ridge and laid down a dotted line to indicate it. He did no surveying to locate it, nor did anyone else. The opinion of Krebs as to the method he would have pursued, the result of his method not being apparent, would be of little probative value on the issues. What would have been the result of his method is quite uncertain. The opinion of an expert witness that certain lines laid down on a surveyor's map are the true lines is not admissible. *State* v. *Pulp Co.,* 108 W. Va., 553, 558. The true location on the ground of such lines depends upon facts and circumstances. ''which the jury are presumed to be capable of understanding without the aid of expert testimony.'' *Mylius* v. *Lumber Company,* 69 W. Va. 346, 368.

Plaintiff assigns cross-error alleging that the jury was not justified, under the title papers of both leases, in fixing the corner at the forks of Tom's Branch. It is true that lease 4 calls for N. 45 E. 2350 feet to *small fork* of Tom's Branch, and lease 2 calls for running with the northwest line of lease 4 about 2250 feet to Tom's Branch. There was much controversy over the location of that corner, and perhaps the jury was warranted in locating the corner at the forks of Tom's Branch, under the evidence of Venable, who said he surveyed to the forks, a point 12,734 feet from C. & O. railroad, and from there laid down the line in dispute, although the map filed as a part of plaintiff's deed delineates that line as reaching Tom's Branch below the forks. However, to extend that line as laid down on the map would make it 3240 feet long, whereas, it is 2350 feet in the lease deed. The location of that corner, under the evidence, was for the jury and its verdict will not be disturbed on the cross assignment.

We think the case was fairly presented to the jury without reversible error, and the judgment is affirmed.

*Affirmed.*