2011 UT 19

**Rob & Sherri BAHR, individuals, and Ione Senn, an individual, Plaintiffs and Petitioners,**

v.

**Jim & Melodee IMUS, individuals, Defendants and Respondents.**

No. 20090646.

Supreme Court of Utah.

April 1, 2011.

Jared L. Bramwell, Steven M. Kelly, Draper, for plaintiffs.

Robert J. Dale, Christian D. Austin, Salt Lake City, for defendants.

Justice LEE, opinion of the Court:

¶ 1 Rob and Sherri Bahr and Ione Senn (the "Bahrs") filed this suit to challenge the location of the boundary between their residential property and that of their neighbors, Jim and Melodee Imus. The district court entered summary judgment in favor of the Imuses, concluding that the Bahrs were precluded from challenging the boundary established by a fence on the property under the doctrine of boundary by estoppel. The court of appeals affirmed.

¶ 2 We agree that the Imuses are entitled to summary judgment, but base our decision on a ground (boundary by agreement) not relied on below. In affirming summary judgment for the Bahrs, we clarify the metes and bounds of the three boundary dispute doctrines identified in our case law, articulating the relationship and distinctions among these theories and refining a few of their elements.

I

¶ 3 The Imuses purchased a new home in a Sandy, Utah, subdivision in 1983. At that time, their yard was not landscaped, and no fences separated the Imuses' backyard from that of their adjoining neighbors to the east and west. Soon thereafter, the Imuses met with their neighbors on the east (the Daltons) and their neighbors on the west (the Wymans) and proposed that they cooperate in fencing in their properties. The Daltons agreed to split the cost of a fence on the boundary they shared with the Imuses. The Wymans agreed to share in the labor to build a fence they would share with the Imuses, but the Imuses consented to purchase all the necessary materials.

¶ 4 The neighbors then set out to determine the locations where the fences would be constructed. Not knowing the actual locations of the plat lines marking the boundaries between their respective properties, the neighbors decided to set the fence locations based on their own calculations and use of a tape measure. All neighbors came to mutual agreement regarding the ultimate locations of the fences. Although the parties understood that their measurements were inexact, each party was satisfied because their calculations showed that each neighbor's backyard measured eighty feet between fences, consistent with the plat. The parties then worked together in constructing the fences.

¶ 5 The Imuses then began extensive landscaping. In addition to planting trees and shrubs, the Imuses installed an irrigation system and a koi pond.

¶ 6 In 1985, the Imuses' neighbors to the west, the Wymans, sold their home to Joe Carlisle, who continued to treat the fence between his property and the Imuses' property as the boundary line. Carlisle later sold his home to Rob and Sherri Bahr in 1988.

¶ 7 Although the Bahrs and Imuses apparently enjoyed a cordial neighborly relationship for a number of years, a boundary dispute eventually arose, at a time that is still in controversy between the parties. The Imuses assert that the dispute did not arise until September 2003, more than twenty years

after the initial installation of the boundary fence. The Bahrs insist that the dispute arose some time earlier, perhaps only nineteen years after the installation of the fence.

¶ 8 Although the precise timing of the dispute is in question, the reason for the dispute is clear. The Imuses had previously planted a Russian olive tree on the Imuses' side of the fence that the Bahrs disliked. The Bahrs requested that the Imuses remove the tree. The Imuses consented, but on the condition that the Bahrs pay for its removal. The Bahrs refused to pay for the removal of the tree. An extensive dispute between the Bahrs and the Imuses ensued, one that included multiple calls to Sandy City municipal authorities.

¶ 9 While the Bahrs were embroiled with the Imuses over the tree, the Bahrs obtained a survey of their property, which showed a .2–foot discrepancy between the platted boundary and the physical location of the Imus–Bahr boundary fence at the front end of the fence that gradually expanded to a 4.7–foot discrepancy at the back end of the fence. The Imuses subsequently sought their own survey, which similarly revealed a discrepancy, though the Imuses' survey showed a 1.12–foot discrepancy at the front end of the fence and a 4.37–foot discrepancy at the back end.

¶ 10 The Bahrs ultimately brought an action seeking to quiet title and, among other things, claiming that the Imuses were trespassing on the Bahrs' property. The Imuses moved for summary judgment, contending that the boundary as marked by the fence had been established by acquiescence or agreement between the parties. In the alternative, the Imuses argued that the Bahrs were equitably estopped from contesting the boundary. The district court granted the Imuses' motion on the latter ground. It found that the elements of equitable estoppel were satisfied because the Wymans and the Imuses had made mutual representations to one another that the line they had established was the boundary, the Imuses had relied on these representations by landscaping the property up to the fence line, and the Imuses would be injured if the boundary established was not upheld.

¶ 11 The Bahrs appealed, and the court of appeals affirmed. *Bahr v. Imus,* 2009 UT App 155, ¶ 17, 211 P.3d 987. In so doing, the court of appeals indicated that it was giving a " 'fair degree of deference' " because boundary by estoppel is a mixed question of law and fact. *Id.* ¶ 5 (quoting *State Dep't of Human Servs. ex rel. Parker v. Irizarry,* 945 P.2d 676, 678 (Utah 1997)).

II

¶ 12 On certiorari to this court, the Bahrs raise a threshold challenge to the standard of review employed by the court of appeals. Citing extensive authority, the Bahrs note that we have consistently reviewed decisions on summary judgment for correctness, according no deference to a trial court's analysis. *Massey v. Griffiths,* 2007 UT 10, ¶ 8, 152 P.3d 312; *Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989).

¶ 13 Despite this precedent, the Imuses defend the deferential standard applied by the court of appeals. Echoing that court's analysis, the Imuses contend that we should give the trial court's decision in this case " 'a fair degree of deference' " because the doctrine of equitable estoppel is a mixed question of law " 'applicable to a wide variety of factual and legal situations.' " *Bahr v. Imus,* 2009 UT App 155, ¶ 5, 211 P.3d 987 (quoting *State Dep't of Human Servs. ex rel. Parker v. Irizarry,* 945 P.2d 676, 678 (Utah 1997)). In the cases cited by the Imuses and relied on by the court of appeals, this court has accorded "differing degrees of deference" to trial court findings on mixed questions of fact and law "depending on several considerations." *Irizarry,* 945 P.2d at 678. In *Irizarry,* we applied a deferential standard of review to a trial court's determination that "the requirements of the law of [equitable] estoppel ha[d] been satisfied." *Id.* Because this case also raises questions of equitable estoppel, the Imuses contend that *Irizarry* dictates a deferential standard of review here.

¶ 14 We disagree. In *Irizarry,* we were reviewing the findings of a trial court issued after a bench trial. *Id.* In that setting, we applied a deferential standard of review to

the question whether the defendant "reasonably changed his position in reliance upon [the plaintiff's] representations"—"a largely factual question" that was "perilously fraught with uncertainty." *Id.* at 681. Although the evidence before the trial court on this question was "somewhat ambiguous," we sustained a deferential standard of review in *Irizarry* on the ground that "the trial judge ha[d] observed 'facts' such as the witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts." *Id.* at 681–82 (internal quotation marks omitted).

¶ 15 This approach has no application to a case like this one, which was decided on summary judgment. In this case, unlike *Irizarry*, the trial court observed no witnesses and made no findings to resolve disputes of fact. Indeed, summary judgment, by definition, cannot resolve genuine disputes of fact. Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." UTAH R. CIV. P. 56(c). A trial court decides such questions, moreover, on the basis of a cold paper record.[1] Since the trial court has no comparative advantage over the appellate court in resolving these questions, the appellate court reviews a summary judgment for correctness, giving no deference to the trial court's decision.[2]

¶ 16 The *de novo* standard of review of summary judgment applies regardless of the nature (fact-intensive or not) of the underlying law governing the parties' rights. Thus, the "mixed" or fact-intensive nature of the elements of equitable estoppel is irrelevant to the standard of appellate review of summary judgment. We review summary judgments for correctness, giving no deference to the trial court's decision (even on questions that would be denominated as "mixed" if they arose on appeal after trial).

¶ 17 That is not to say that the nature of the underlying legal question is irrelevant to our (or the trial court's) consideration of summary judgment. Fact-intensive claims are inherently less likely to be resolved on summary judgment. *See, e.g., Hunt v. Hurst,* 785 P.2d 414, 415 (Utah 1990) (noting that "[o]rdinarily, the question of negligence is a question of fact for the jury," so "summary judgment is appropriate in negligence cases only in the most clear instances"). A case involving a plaintiff's right to prevail on a theory of equitable estoppel is a good example. If there are factual disputes about the nature and extent of the plaintiff's reasonable reliance, the moving party may struggle to establish the propriety of summary judgment. That does not mean that a decision on summary judgment itself would be given deference on appeal, however. An appellate court in such a case would make its own decision on the correctness of summary judgment, reviewing the same paper record that was before the trial court to decide whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law.

---

1. *See Pratt v. Mitchell Hollow Irrigation Co.,* 813 P.2d 1169, 1171 (Utah 1991) (noting that when reviewing a grant of summary judgment "[w]e consider only the pleadings, depositions, admissions, answers to interrogatories, and affidavits properly before the trial judge"); *see also Shields v. Eli Lilly & Co.,* 895 F.2d 1463, 1466 (D.C.Cir. 1990) ("Since pretrial summary judgment decisions are rendered exclusively on the basis of a 'paper' record, an appellate court is equally well-positioned as a trial judge to assess the evidence at issue.").

2. *See, e.g., State v. Pena,* 869 P.2d 932, 936 (Utah 1994) (explaining that the deference given to a trial court's findings at trial rests on the fact that the trial judge is "considered to be in the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole,

something an appellate court cannot hope to garner from a cold record"); *see also ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo.1993) ("As the trial court's [summary] judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment."); Jack H. Friedenthal & Joshua E. Gardner, *Judicial Discretion to Deny Summary Judgment in the Era of Managerial Judging,* 31 HOFSTRA L.REV. 91, 112–13 (2002) ("The appellate court is in the same position as was the trial court in determining whether the motion [for summary judgment] is appropriate. Therefore, a *de novo* review of a district court's grant of summary judgment is entirely justified." (emphasis omitted) (footnote omitted)).

¶ 18 Thus, the court of appeals in this case applied the wrong standard of review to the extent it deferred to the district court's evaluation of the Imuses' entitlement to summary judgment. We accordingly proceed to review that decision for correctness.

### III

¶ 19 The parties' briefs at trial and on appeal addressed all three boundary dispute theories articulated in our case law: boundary by estoppel, boundary by acquiescence, and boundary by agreement. Each of these theories fills a distinct niche in the law, though their separate roles have not been completely illuminated in our cases.

¶ 20 Because all three doctrines are implicated here, we take this opportunity to delineate the nature and elements of these doctrines and to clarify their relationship to one another. In so doing, we refine and revise some of the governing elements of the law in this area. To distinguish boundary by acquiescence and boundary by agreement, for example, we repudiate the requirement that a boundary by agreement be established by proof of the passage of a period of "sufficiently long acquiescence" by the parties to an oral agreement. *See Blanchard v. Smith,* 123 Utah 119, 255 P.2d 729, 730 (1953).

¶ 21 Under the three boundary dispute theories as explained and refined below, we find that the Imuses were not entitled to summary judgment on the basis of boundary by estoppel or boundary by acquiescence. We affirm summary judgment for the Imuses, however, on the alternative basis of an enforceable oral agreement establishing a boundary by agreement on the parties' fence line.

### A. Boundary by Estoppel

¶ 22 Boundary by estoppel is an equitable doctrine designed to prevent fraud and injustice by protecting innocent landowners who reasonably rely on representations by their neighbors regarding their shared boundary lines.[3] Our cases have noted the availability of this theory, but have never delineated its precise elements.[4]

¶ 23 In other contexts (outside the setting of a boundary dispute), we have articulated three requirements for invocation of the doctrine of equitable estoppel: "(1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act." *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 602 P.2d 689, 694 (Utah 1979) (internal quotation marks omitted); *see also CECO Corp. v. Concrete Specialists, Inc.,* 772 P.2d 967, 969–70 (Utah 1989). We now extend these elements—with some modification—to the specific context of a boundary dispute.

¶ 24 First, where a party seeks to establish a property boundary through equitable estoppel, it must establish an *affirmative statement* by a neighboring landowner regarding the location of a shared boundary. In a boundary dispute case, such representation presumably will be "inconsistent with [a] claim afterwards asserted," as where the party who made affirmative representations regarding the boundary seeks to establish a different boundary in subsequent litigation.

¶ 25 Requiring an affirmative representation comports with the reliance-based rationale undergirding the doctrine of boundary by estoppel: "When a man has been

---

3. *See Tripp v. Bagley,* 74 Utah 57, 276 P. 912, 918 (1928) (explaining that the doctrine of boundary by estoppel is premised on the protection of the legitimate reliance interests of innocent parties); *see also Douglass v. Rowland,* 540 S.W.2d 252, 254 (Tenn.Ct.App.1976).

4. *See, e.g., Staker v. Ainsworth,* 785 P.2d 417, 423 n. 4 (Utah 1990) (explaining that boundary by agreement, boundary by estoppel, and boundary by acquiescence are distinct doctrines, but declining to set forth the elements of boundary by estoppel); *Hales v. Frakes,* 600 P.2d 556, 558 (Utah 1979) (referring to boundary by estoppel merely to explain that "boundary by agreement falls somewhere between adverse possession and estoppel"); *Tripp,* 276 P. at 918 (noting that a person may only rely on a claim of boundary by estoppel if that person was ignorant of the true boundary).

misled by the untruth propounded by another, and acted to his detriment in reliance upon the misrepresentation, the misleading party will be estopped to show that the true facts are contrary to those he first propounded." *See Douglass*, 540 S.W.2d at 254 (internal quotation marks omitted). At the same time, the requirement of an affirmative representation regarding the true boundary safeguards the important interests of record title owners against inadvertent relinquishment of their rights to properties titled in their names.

¶ 26 This articulation of the first element of boundary by estoppel consciously excludes the possibility of an estoppel that is premised on an act or omission falling short of an affirmative representation. This limitation is necessary to preserve a distinction between boundary by estoppel (which is aimed at avoiding inequities arising from reliance on affirmative representations) and boundary by acquiescence (which determines the impact of other acts or omissions).

¶ 27 The Bahrs ask us to impose another limitation on boundary by estoppel. Citing cases from other jurisdictions,[5] the Bahrs insist that estoppel should be available only where the representation in question is made by one who acts either in bad faith or with superior knowledge. While some of our sister states have adopted one or both of these as elements of boundary by estoppel, we reject them as incompatible with the reliance-based rationale underlying this doctrine. In a boundary by estoppel case, a court's attention is properly focused on the innocent party that reasonably relied upon a misstatement, not on the subjective intentions of the party that made that misstatement.

¶ 28 Second, a party seeking to invoke the doctrine of boundary by estoppel must show that it has engaged in some act in reasonable reliance on the representation of the neighboring property owner. *See Tripp,*

276 P. at 918. This element requires proof that the party seeking to invoke estoppel has "change[d] his position" on the basis of the misrepresentation of the neighboring landowner. *Rautenberg v. Munnis,* 108 N.H. 20, 226 A.2d 770, 772 (1967).

¶ 29 For reliance to be reasonable, "the truth concerning the facts relied upon by the person claiming the benefit of the estoppel" must have been unknown. *Tripp,* 276 P. at 918. Thus, parties invoking boundary by estoppel must have been ignorant of the true boundary between their property and the property of their neighbor. As in boundary by acquiescence cases, however, a party need not demonstrate that there was "objective uncertainty" regarding the true location of the boundary, *see Staker,* 785 P.2d at 423, though a showing of objective uncertainty would certainly reinforce a plaintiff's showing of reasonable reliance.

¶ 30 Third, the final element of boundary by estoppel is proof of injury. *See Great Plains Oil & Gas Co. v. Found. Oil Co.,* 137 Tex. 324, 153 S.W.2d 452, 459 (1941). In evaluating whether a plaintiff's injury is sufficient to sustain an estoppel, the courts should recall the founding rationale of the doctrine—the protection of reasonable reliance interests. *See Tripp,* 276 P. at 918. Thus, an injury is of sufficient gravity to sustain an estoppel if it is such that it would render it unfair or unreasonable to enforce the record title boundary in the face of that injury. *See* James H. Backman, *The Law of Practical Location of Boundaries and the Need for an Adverse Possession Remedy,* 1986 BYU L. REV. 957, 968.

¶ 31 The Bahrs ask us to adopt additional limitations—embraced in some other jurisdictions—on the nature of the injury required to sustain an estoppel. Specifically, the Bahrs contend that boundary by estoppel should be limited to cases involving a "permanent improvement" in reliance on a neigh-

---

5.  *See, e.g., Wojahn v. Johnson,* 297 N.W.2d 298, 304 (Minn.1980) ("Estoppel: The party whose rights are to be barred must have silently looked on with knowledge of the true line while the other party encroached thereon or subjected himself to expense which he would not have

incurred had the line been in dispute."); *Great Plains Oil & Gas Co. v. Found. Oil Co.,* 137 Tex. 324, 153 S.W.2d 452, 459 (1941) (explaining that conduct or statements calculated to mislead the party claiming an estoppel are required elements).

boring landowner's representations.[6] Because the Imuses' landscaping, koi pond, and irrigation system were not sufficiently "permanent" in the Bahrs' estimation, the Bahrs challenge the Imuses' entitlement to invoke boundary by estoppel.

¶ 32 We decline to adopt such a limitation on the injury element of boundary by estoppel. The question of an improvement's "permanence" is not susceptible to principled judicial evaluation. No improvement is literally permanent, as anything can be moved or altered with a sufficient outlay of resources. Thus, when courts speak of an improvement as "permanent," they are effectively concluding that estoppel is appropriate in light of the substantiality of the plaintiff's injury. Instead of condoning an arbitrary evaluation of the question of permanence, we direct the courts of this state to inquire directly into the substantiality of the claimant's injury.

¶ 33 To summarize, to successfully invoke the doctrine of boundary by estoppel, a party must demonstrate: (1) that the record title owner or her predecessor in interest made an affirmative misstatement that a given line was the true boundary between the neighbors' properties, (2) that the innocent party took affirmative action in reasonable reliance on this misstatement, and (3) because of this affirmative action the innocent party would suffer sufficiently substantial injury that it would now be unfair or unreasonable to enforce the record title boundary.

¶ 34 Applying these elements to this case, we find that the Imuses' estoppel claim fails on the threshold first element. In this case, there was no misrepresentation regarding the true location of the boundary by either the Bahrs or their predecessors in interest. In fact, the record shows that the Bahrs' predecessors (the Wymans and Joe Carlisle) acknowledged that they did not know the true location of the boundary between their properties. Rather, there was a mutual agreement that the boundary would be located in the spot where the fence dividing the Bahrs' and the Imuses' property currently stands. Where (as here) there is mutual uncertainty regarding the true location of a dividing boundary between adjoining properties, there is no representation and thus no basis for a judgment of boundary by estoppel.

## B. Boundary by Acquiescence

¶ 35 The doctrine of boundary by acquiescence is rooted in policy considerations of "avoiding litigation and promoting stability in landownership." *Staker v. Ainsworth*, 785 P.2d 417, 423 (Utah 1990). It "derives from [the] realization, ancient in our law, that peace and good order of society [are] best served by leaving at rest possible disputes over long established boundaries." *Id.* (internal quotation marks omitted). A successful invocation of boundary by acquiescence requires a showing of the following four elements: "(1) occupation up to a visible line marked by monuments, fences, or buildings, (2) mutual acquiescence in the line as a boundary, (3) for a long period of time, (4) by adjoining landowners."[7] *Id.* at 420 (internal quotation marks omitted).

¶ 36 The first element may be satisfied where land up to the visible, purported boundary line is farmed, occupied by homes or other structures, improved, irrigated, used to raise livestock, or put to similar use. *See id.* In evaluating whether this element is satisfied, courts should consider whether a particular "occupation up to a visible line" would place a reasonable party on notice that the given line was being treated as the boundary between the properties.

¶ 37 The second element is satisfied where neighboring owners "recognize

---

6. *See, e.g., Kincaid v. Morgan*, 188 W.Va. 452, 425 S.E.2d 128, 133 (1992) (holding that a boundary by estoppel claim requires "permanent improvements" (internal quotation marks omitted)); *Pickett v. Nelson*, 71 Wis. 542, 37 N.W. 836, 838 (1888) (requiring "permanent improvements" in order to sustain a boundary by estoppel claim).

7. We once required a fifth element—"objective uncertainty" regarding the true boundary line. We rejected this element in *Staker v. Ainsworth*, however, noting that the element had made "boundary by acquiescence less practical" and in fact seemed to "increase litigation over boundaries rather than decrease it." *See id.* at 423.

and treat an observable line, such as a fence, as the boundary dividing the owner's property from the adjacent landowner's property." *Ault v. Holden*, 2002 UT 33, ¶ 19, 44 P.3d 781. This element is met where neighbors do not "behave[ ] in a fashion inconsistent with the belief" that a given line is the boundary between their properties. *Staker*, 785 P.2d at 420. Failure by the record title owner to "suggest or imply" that the dividing line between the properties is "not in the proper location" suggests acquiescence. *Judd Family Ltd. P'ship v. Hutchings*, 797 P.2d 1088, 1090 (Utah 1990). Nonacquiescence in a boundary would be signaled where, for example, a landowner notifies the adjoining landowner of her disagreement over the boundary, or takes action inconsistent with recognition of a given line as the boundary, such as tearing "down significant portions of [a] fence and, without objection by [the adjoining landowner], proceed[ing] to plant trees and shrubs, store firewood, and construct a chain link fence in a different location." *See Staker*, 785 P.2d at 421.

■■■ ¶ 38 To satisfy the third element, an unbroken period of no less than twenty years must pass during which each of the other elements is continuously met.[8] *See id.* at 420; *see also Parsons v. Anderson*, 690 P.2d 535, 539 (Utah 1984) (explaining that fifteen years of mutual acquiescence was insufficient). To satisfy the fourth element, "the parcels involved" must be "contiguous." *Staker*, 785 P.2d at 420.

■■ ¶ 39 The Imuses are not entitled to summary judgment under this theory because there is factual uncertainty about when the Bahr–Imus dispute arose. In light of the genuine issue of material fact as to whether there was a full, twenty-year period of acquiescence in the location of the boundary line, the Imuses are not entitled to judgment as a matter of law under this doctrine.

### C. Boundary by Agreement

■■ ¶ 40 Boundary by agreement is "predicated on a principle of repose [and is]

designed to set at rest boundaries commonly the subject of strife." *Blanchard v. Smith*, 123 Utah 119, 255 P.2d 729, 730 (1953). We have previously clarified the requirements of this doctrine: "[W]hen the location of the true boundary line between two adjoining tracts of land is unknown, uncertain or in dispute, the owners thereof may, by parol agreement, establish the boundary line" and, acting in reliance on their agreement, "thereby irrevocably bind themselves." *Hummel v. Young*, 1 Utah 2d 237, 265 P.2d 410, 411 (1953); *see also Tripp v. Bagley*, 74 Utah 57, 276 P. 912, 916 (1928). Through sufficient demarcation of the agreed-upon boundary, parties may also bind their successors in interest. *Brown v. Milliner*, 120 Utah 16, 232 P.2d 202, 207 (1951).

■■ ¶ 41 Thus, the required elements of boundary by agreement are: (1) an agreement between adjoining landowners, (2) settling a boundary that is uncertain or in dispute, (3) a showing that injury would occur if the boundary were not upheld, and (4) where the doctrine is being invoked against successors in interest, demarcation of a boundary line such that a reasonable party would be placed on notice that the given line was being treated as the boundary line between the properties. *See Hummel*, 265 P.2d at 411; *Brown*, 232 P.2d at 207; *Tripp*, 276 P. at 916.

■■ ¶ 42 The first element of boundary by agreement requires that there be an "express agreement" between adjoining landowners. *Staker v. Ainsworth*, 785 P.2d 417, 423 (Utah 1990). This agreement may be oral, *see Tripp*, 276 P. at 916, but it must be explicit. An inference of an agreement based on mere acts or omissions of the parties is the domain of boundary by acquiescence. Boundary by agreement requires an actual, express statement of agreement between the parties.

■■■ ¶ 43 An oral agreement "between adjoining owners as to the location of a

---

8. In prior cases, this court has maintained that "under unusual circumstances ... less than twenty years" of mutual acquiescence may "be sufficient to establish boundary by acquiescence." *Id.* at 420. But we have never identi-

fied any such "unusual circumstances." And the parties have not alleged, and we are not aware of, any unusual circumstances in this case that would permit us to lessen the "long period of time" required by our case law.

boundary line" does not violate the statute of frauds, "provided the agreement is followed by actual ... possession by each of the owners up to the line so agreed upon, and provided further, that the proper location of the line is uncertain or in dispute." *Id.* (internal quotation marks omitted). "[I]f the location of the true boundary is not known to the adjoining owners, a parol agreement between them fixing its location is not regarded as transferring an interest in land but merely determining the location of existing estates." [9] *Brown*, 232 P.2d at 207. This exception to the statute of frauds has "long been recognized" by the courts of this state, *Hummel*, 265 P.2d at 411, and we reaffirm it here.

¶ 44 In our prior cases, we have suggested that boundary by agreement also requires a showing of a passage of a long period of time. *See Blanchard*, 255 P.2d at 730 ("We repeatedly have held that neighbors, by oral agreement[,] may establish a common boundary which, after sufficiently long acquiescence, cannot be disestablished."). We now repudiate that requirement. It has no place in a doctrine that turns on a showing of an express agreement. Once such agreement is proven, it may form the basis for an enforceable boundary—without respect to the length of time in which the parties have embraced it.[10]

¶ 45 A requirement of a long period of acquiescence does not comport with the policy of repose upon which boundary by agreement is premised because it creates continued uncertainty even following an express agreement between adjoining landowners regarding the location of the boundary

between their properties. Consideration of the temporal period of the parties' acquiescence should be limited to a claim of boundary by acquiescence.

¶ 46 Although an oral agreement is sufficient to sustain a boundary by agreement, reliance upon such an agreement may be inadvisable because "sufficient proof of an [oral] agreement is often difficult to come by." *Staker*, 785 P.2d at 423. Problems of proof suggest that the "doctrine of boundary by agreement is not often invoked" successfully. *Id.* A party lacking the requisite proof will likely be forced to rely instead on the more restrictive doctrine of boundary by acquiescence, with its attendant twenty-year acquiescence requirement.

¶ 47 The second element of boundary by agreement—uncertainty or dispute about the location of a boundary—is necessary to satisfy the statute of frauds. Without this element, an oral agreement setting a boundary would effect an impermissible "transfer of the land" instead of a permissible "location of the existing estate." *Tripp*, 276 P. at 918 (internal quotation marks omitted); *see also Brown*, 232 P.2d at 207.

¶ 48 This uncertainty requirement mandates that a party seeking to rely on boundary by agreement must show that she was uncertain of the true location of the boundary between her property and her neighbor's property. Again, however, "objective uncertainty" is not required. *See Staker*, 785 P.2d at 423.[11] Subjective uncertainty is sufficient. A requirement of objective uncertainty would undermine the legitimate policy interests undergirding the doctrine of boundary by agreement by re-

9. Many other jurisdictions have long used the same rationale to justify the doctrine of boundary by agreement. *See, e.g., Hoyer v. Edwards*, 182 Ark. 624, 32 S.W.2d 812, 814 (1930); *Clapp v. Churchill*, 164 Cal. 741, 130 P. 1061, 1063 (1913); *Moran v. Choate*, 253 Ky. 470, 69 S.W.2d 994, 995–96 (1934); *Hanlon v. Ten Hove*, 235 Mich. 227, 209 N.W. 169, 170 (1926); *Engle v. Beatty*, 41 Ohio App. 477, 180 N.E. 269, 270–71 (1931); *Ferrill v. Bryson*, 37 S.W.2d 841, 841–42 (Tex.Civ.App.1931). Modern cases continue to rely on the same rationale. *See, e.g., Goodman v. Lothrop*, 143 Idaho 622, 151 P.3d 818, 823 (2007); *Hartzler v. Uftring*, 114 Ill.App.3d 427, 71 Ill.Dec. 329, 450 N.E.2d 1208, 1210 (1983).

10. *Accord Collins v. Burchfield*, 215 Ga. 322, 110 S.E.2d 368, 369 (1959) (explaining that an oral agreement may establish a boundary line without any mandatory passage of time).

11. *Accord Sobol v. Gulinson*, 94 Colo. 92, 28 P.2d 810, 811 (1933) ("The fact that the boundary line could have been ascertained by having a survey made does not ... prevent there being an uncertainty, within the meaning of the rule. To bring a case within the rule it is not necessary that the true line should be absolutely unascertainable.").

stricting its potential use to such a high degree that the doctrine would lose its utility.

¶ 49 The third element of boundary by agreement—injury that would result if a boundary agreement were not upheld because of action taken in reliance on that agreement—helps ensure that the important interests of record title holders are not unnecessarily undermined. Parties who actually enter into an agreement about the location of an uncertain or disputed boundary are likely to take some action to execute their agreement. Such action might include expending resources to assert ownership of the land up to the agreed-upon line, building fences, or cultivating or controlling the land up to the boundary. *See Tripp*, 276 P. at 916; *Callaway v. Armour*, 207 Ga. 229, 60 S.E.2d 367, 369 (1950); *Brock v. Muse*, 232 Ky. 293, 22 S.W.2d 1034, 1035 (1929); *Hanlon v. Ten Hove*, 235 Mich. 227, 209 N.W. 169, 170 (1926); *Eidman v. Goldsmith*, 149 Or.App. 7, 941 P.2d 1045, 1048 (1997); *Thompson v. Jamison*, 699 S.W.2d 687, 688 (Tex.App.1985).

¶ 50 If a party fails to take any action following an agreement, no injury will result from a court declining to enforce the agreement. *See Clear Fork Coal Co. v. Anchor Coal Co.*, 111 W.Va. 219, 161 S.E. 229, 233–34 (1931) (noting that the record title owner could still claim the record title boundary line where the party seeking to rely upon boundary by agreement had only marked the agreed boundary line on a mine map because such an agreement had to "be carried into execution by the parties by full actual possession of the line"). Therefore, claims of boundary by agreement will succeed only where a party has placed enough reliance on the agreement that it would now be unjust not to enforce it.

¶ 51 The fourth element of boundary by agreement—sufficient demarcation of the boundary line—is operative only in cases involving successors in interest to the parties to the original boundary agreement. This requirement is premised upon general considerations of equity and fairness. While it is fair and equitable to bind the original parties to a boundary agreement on the basis of their agreement, it would be unfair and inequitable to bind their successors in interest in the absence of objective indicia that would place such third parties on notice regarding the boundary agreed upon. This requirement is satisfied where the objective indicia suggesting the existence of a boundary line would place a reasonable party on notice that the line was being treated as the boundary line between the properties. *See McCabe v. Moore*, 38 S.W.2d 641, 643 (Tex.Civ.App.1931).

¶ 52 Though the fourth element will often be satisfied where the third element is satisfied, the two elements are not always coexistent. Whereas the third element focuses on actions taken by an original party to a boundary agreement, the fourth element considers whether the physical indicia of those actions would be sufficiently apparent to a third party. Thus, the elements focus on distinct actors.

¶ 53 We find that the Imuses are entitled to summary judgment under the doctrine of boundary by agreement. The first element is satisfied because there was an agreement between the Imuses and the Bahrs' predecessors in interest, the Wymans, regarding the location of the boundary that would thereafter separate their adjoining properties. Affidavits from the Wymans and Imuses corroborate the existence of this agreement, which was an oral one.

¶ 54 The second element—uncertainty or dispute about the location of the boundary—is also satisfied. The record does not establish objective uncertainty at the time the Imuses and the Bahrs' predecessors in interest entered into their boundary agreement, since their properties were located in a platted subdivision and a survey could have revealed the true location of the boundary. But we have rejected the need for objective uncertainty. All that is required is subjective uncertainty regarding the location of the line. In this case, the record demonstrates that neither the Imuses nor the Wymans knew the location of the boundary line between their properties.

¶ 55 The third element—a showing of sufficient action in reliance on the boundary

agreement that it would be unjust to not uphold that agreement—is also fulfilled. The Imuses acted in reliance on their agreement with the Bahrs' predecessors in interest, the Wymans, by constructing a fence on the agreed-upon boundary line, landscaping, and installing a koi pond and irrigation system. Given the significant efforts expended by the Imuses as a result of their agreement with the Wymans, declining now to enforce the agreement would injure the Imuses unjustly.

¶ 56 The fourth element of boundary by agreement—sufficient demarcation of the boundary line—must be met in this case because the Bahrs are successors in interest to the Wymans, the original party to the boundary agreement with the Imuses. We hold that this element is satisfied because the fence separating the Bahrs' and Imuses' properties would have placed a reasonable party on notice that the line established by the Wyman–Imus boundary agreement was being used as the border between the properties. All four elements of boundary by agreement are accordingly satisfied under the undisputed facts of this case, and the Imuses were entitled to judgment as a matter of law under this doctrine.

## IV

¶ 57 Having found that all the elements of boundary by agreement are satisfied, we affirm the judgment of the court of appeals on the alternative ground of boundary by agreement. Doing so gives effect to the policies that underlie boundary by agreement through "set[ting] at rest" this boundary line dispute that has been the "subject of [much] strife" between the Bahrs and Imuses. *Blanchard v. Smith,* 123 Utah 119, 255 P.2d 729, 730 (1953).

¶ 58 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice LEE's opinion.