**2022 UT App 85**

# THE UTAH COURT OF APPEALS

STEVE TURLEY,
Appellee,
*v.*
TRUDY J. CHILDS AND RORY J. CHILDS,
Appellants.

Opinion
No. 20210390-CA
Filed July 8, 2022

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
The Honorable Robert C. Lunnen
No. 190401185

Barry N. Johnson, Daniel K. Brough, and Ryan M.
Merriman, Attorneys for Appellants

Craig Carlile and Brent D. Wride,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1 More than a decade ago, Trudy and Rory Childs (the Childs Parties) agreed to provide Steve Turley an option to purchase certain real property. In the years since then, Turley has filed two lawsuits aimed at compelling the Childs Parties to recognize his exercise of that option and to complete the conveyance. The district court in the second lawsuit entered summary judgment in Turley's favor, and the Childs Parties now appeal. We affirm.

BACKGROUND[1]

¶2    Since at least 2008, the Childs Parties have owned approximately 2,600 acres of real property (the Property) located in the Diamond Fork area of Spanish Fork Canyon, in Utah County, Utah. In 2008, the Childs Parties conveyed to Turley an option to purchase the Property. Later that year, Turley sought to exercise that option, but the Childs Parties refused to sell. Turley then filed suit (the First Lawsuit) against the Childs Parties, seeking an order compelling them to convey the Property. After some six years of litigation, with both sides represented by counsel, the case proceeded to trial in December 2014. But during the trial, the parties informed the court that they had reached an agreement to settle the case (the Agreement). The parties set forth the terms of the Agreement in an unsigned handwritten memorandum, and the parties also recited, in open court, the particulars of the Agreement for the record.

¶3    Under the terms of the Agreement, as recited by Turley's attorney on the record, the Childs Parties were to market the Property generally for eight months, and would "grant to [Turley] a right of first refusal to purchase" the entire Property; that right of first refusal was to exist for the entirety of the eight-month marketing period. During that period, the Childs Parties were to "give [Turley] 60 days notice of any bona fide offer," and it was "understood that if an offer came in on the last day of the eight-

---

1. Ordinarily, when reviewing a grant of summary judgment, we view "the facts in a light most favorable to the losing party below." *Goodnow v. Sullivan*, 2002 UT 21, ¶ 7, 44 P.3d 704 (quotation simplified). In this case, however, Turley's summary judgment motion was not timely opposed, and (as discussed below) the district court treated all facts contained in the motion as admitted. *See* Utah R. Civ. P. 56(a)(4). We therefore recite the facts as framed by Turley's motion, but—as discussed below, *infra* Part II.A—we still consider inferences that might be drawn from those admitted facts in a light favorable to the Childs Parties.

month period [the parties] would still have 60 days to effectuate" a closing. "At the end of eight months if the [P]roperty ha[d] not been sold or [was] not under contract to be sold," Turley could "purchase [the Property] . . . at an appraised amount." If the parties did not "agree on the appraisal that [came] forward," then each side would "identify an appraiser" and "[t]hose two appraisers [would] then identify a third appraiser" whose valuation would serve as "the appraised value" that Turley would "pay in order to purchase [the Property]." The appraisal was to "comply with the federal standards, which are commonly referred to as yellow book standards."

¶4     After Turley's attorney finished reciting the terms of the Agreement, the Childs Parties' attorney confirmed that "that is our agreement." The court then asked both Trudy and Rory Childs if that was "the agreement as [they] underst[ood] it," and they each replied in the affirmative. The parties then stated their intent to "formalize" the Agreement and, at a later date, "provide to the court a notice of dismissal" of the lawsuit.

¶5     The parties, however, were never able to "formalize" the Agreement to their mutual satisfaction. Over the next couple of years, they exchanged various draft documents, but were unable to agree on the terms of a formal settlement document. At one point, the court issued a notice asking the parties to show cause why their dormant First Lawsuit should not be dismissed, and the parties responded with a joint statement, signed by counsel for both sides, stating that they were working on a formal document but "there exists a dispute about a couple of terms that the parties are trying to resolve," and expressed their belief that the last remaining issues would be resolved within thirty days. But the parties' optimism was misplaced, and eventually Turley filed a motion to enforce the Agreement. In response, the Childs Parties filed a document asserting, among other things, that they would be "happy to sign a printed copy of the [trial] transcript together with [the unsigned handwritten memorandum] as the final agreement." A few months later, the parties agreed to dismiss the

First Lawsuit with prejudice, even though no formal settlement document had been signed.

¶6     In the meantime, the Childs Parties had moved forward with marketing the Property. No third-party buyer made an offer on the Property, so each side selected an appraiser, and those two appraisers selected a third appraiser (Appraiser 1). But the Childs Parties objected to Appraiser 1, and he was unable to complete his work. Later, however, the parties agreed to have a different appraiser (Appraiser 2) perform an appraisal of the Property, but he also discontinued his efforts, apparently due to the Childs Parties' refusal to sign an engagement letter for his services. Finally, Turley re-engaged Appraiser 1—the appraiser selected by the two sides' chosen appraisers—and asked him to complete an appraisal on the Property. After completing his work, Appraiser 1 issued a lengthy report in which he concluded that the Property's value was $1.618 million. Within a week of the issuance of Appraiser 1's report, Turley tendered $1.618 million to the Childs Parties via cashier's check.

¶7     During this time, Turley filed a second motion to enforce the Agreement, and did so under the auspices of the dismissed First Lawsuit. The Childs Parties filed no opposition to Turley's motion and the court therefore granted it, but the Childs Parties objected to the form of the order granting Turley's motion. The court scheduled a "status conference" for May 14, 2018, to discuss the situation. Four days before the scheduled hearing, on May 10, the Childs Parties filed a bankruptcy petition, an act that required the court to postpone the hearing.[2] The Childs Parties dismissed

---

2. A bankruptcy petition operates as an automatic stay of most litigation involving the debtor, including all collection and enforcement proceedings. *See* 11 U.S.C. § 362(a), (b). After that point, litigation involving the debtor may continue only with permission of the bankruptcy court. *See id.* § 362(d), (f) (stating that the bankruptcy court "shall grant relief from the stay" under certain circumstances).

their bankruptcy petition in June 2018, and the court rescheduled the hearing for August 13, 2018. But the day before that hearing, on August 12, Trudy Childs filed a bankruptcy petition, an act that required the court to again postpone consideration of the matter. The second bankruptcy petition was dismissed in December 2018.

¶8     At that point, Turley filed a second lawsuit (the instant lawsuit, referred to herein as "the Second Lawsuit") to seek enforcement of the Agreement. In particular, Turley brought claims for declaratory judgment that the Agreement was valid and enforceable and for specific performance under the Agreement. The attorney who had previously represented the Childs Parties in the First Lawsuit did not enter an appearance on their behalf in the Second Lawsuit, but he did apparently assist them in filing a pro se answer to Turley's complaint. As the case progressed, the Childs Parties, now proceeding pro se, did not submit initial disclosures or conduct any discovery, and after the discovery deadline passed, Turley filed a motion for summary judgment and for sanctions.

¶9     Turley's motion—which encompassed some 513 pages and included twenty-five exhibits, including affidavits, deposition transcripts, court documents from the First Lawsuit, and Appraiser 1's full report—was filed on August 18, 2020. In the motion, Turley argued that the Agreement was "a binding, enforceable contract as read into the court record" at the trial in 2014. Specifically, Turley asserted that the Childs Parties had agreed that what was read into the record accurately reflected their agreement, that it was common for oral agreements to later be formalized, and that any lack of later memorialization did not "preclude the enforcement or finality of [the Agreement] . . . so long as the terms [were] sufficiently definite as to be capable of being enforced." Turley also pointed out that the Childs Parties had earlier stated that they were "happy to sign a printed copy of the [t]rial transcript together with [the unsigned handwritten memorandum] as the final agreement."

¶10 And Turley asserted that he had performed pursuant to the Agreement. No buyer had offered to purchase the Property during the eight-month marketing period, and therefore Turley's right to purchase the Property for an appraised value was triggered. Thereafter, each side had designated an appraiser, and those two appraisers selected Appraiser 1 to value the Property. Appraiser 1's valuation was delayed due to the Childs Parties' objection, but he eventually completed an appraisal of the Property, valuing it at $1.618 million. And Turley tendered that amount to the Childs Parties.

¶11 In the part of his motion addressing sanctions, Turley also asserted that the Childs Parties had not complied with their obligations during discovery, specifically pointing out that they had not submitted initial disclosures and had failed to attend their duly noticed depositions. Although Turley sought sanctions pursuant to both rule 26 and rule 37 of the Utah Rules of Civil Procedure, Turley had not—before filing the motion—filed any statement of discovery issues bringing to the court's attention any of the Childs Parties' alleged discovery violations.[3]

---

3. As the district court correctly recognized, rule 37 sanctions are not available for certain discovery violations unless the complaining party first files a statement of discovery issues and obtains a court order commanding compliance, and can demonstrate that the other party failed to comply with the order. *See* Utah R. Civ. P. 37(b) (stating that the court "may impose appropriate sanctions for the failure to follow its orders"); *see also Eskamani v. Auto-Owners Ins. Co.*, 2020 UT App 137, ¶ 49, 476 P.3d 542. But the situation may be different if the specific discovery failure at issue is a party's failure to attend a duly noticed deposition. *See* Utah R. Civ. P. 37(d) (authorizing a party to "file a motion for sanctions" if another party "fails to appear" at a duly noticed deposition, and stating that "[t]he failure to appear may not be excused on the ground that the discovery sought is

(continued…)

¶12 The Childs Parties did not timely oppose Turley's motion; instead, on September 1, 2020—just days before their opposition memorandum would have been due—Trudy Childs filed yet another bankruptcy petition. On October 15, however, the bankruptcy case was dismissed, apparently due to Trudy Childs's failure to complete the required pre-filing credit counseling briefing prior to filing.

¶13 Two weeks later, on October 30—after the court had scheduled a hearing for November 3 to consider the pending motions—a new attorney entered an appearance on behalf of the Childs Parties and filed a belated memorandum in opposition to Turley's motion, as well as a motion of their own asking the court to reset the case deadlines, including discovery deadlines and the deadline for responding to Turley's motion. At the November 3 hearing, the court continued the oral argument in light of "recent[ly] filed documents," and reset the hearing for December 4. In the interim period, Turley filed a lengthy reply memorandum in support of his motion, in the event the court allowed the Childs Parties to file their belated memorandum.

¶14 Following oral argument, the district court took the matter under advisement, and later issued a written decision. In that ruling, the court denied the Childs Parties' motion to reschedule the case deadlines, concluding that the Childs Parties had not demonstrated excusable neglect for their failure to conduct discovery or timely respond to Turley's motion. In particular, the court found that the Childs Parties had acted in bad faith in connection with their repeated bankruptcy filings, and determined that the Childs Parties had not shown any good reason for their delay. The court therefore refused to consider the Childs Parties' belated opposition memorandum, thereby

---

objectionable unless the party failing to appear has filed a statement of discovery issues"). We need not delve deeper into these issues in this case, and leave further exploration of these rules for future cases in which the issue is squarely presented.

rendering Turley's motion unopposed. Then, applying the now undisputed facts from Turley's unopposed motion, the court concluded that there were no genuine issues of material fact that precluded summary judgment in favor of Turley, and that Turley was entitled to judgment as a matter of law. The court therefore granted Turley's motion for summary judgment, specifically declaring the Agreement to be valid and issuing an order for specific performance of its terms.

## ISSUES AND STANDARDS OF REVIEW

¶15   The Childs Parties now appeal, raising two issues that require our attention.[4] First, they argue that the district court abused its discretion by refusing to grant their motion to reset the case deadlines and allow them leave to file a belated memorandum in opposition to Turley's motion for summary judgment. A decision to grant or deny a motion for extension of time is discretionary, and "we will not reverse the court's decision absent an erroneous conclusion of law or where there is no

---

4. The Childs Parties also raise a challenge to the district court's ruling regarding sanctions. Although the court rejected Turley's request for sanctions pursuant to rule 37(d) of the Utah Rules of Civil Procedure on the basis that Turley had not filed a statement of discovery issues, the court granted Turley's request— grounded in rule 26(d)(4) of the Utah Rules of Civil Procedure— to forbid the Childs Parties from presenting any undisclosed evidence at trial. The Childs Parties challenge the court's order of exclusion, asserting that the order went too far in that it prevented the Childs Parties from "relying even upon documents, witnesses, and information that Turley himself disclosed." We need not consider this challenge, however, because—as discussed below— we affirm the court's entry of summary judgment in Turley's favor. When a case ends at the summary judgment stage, it is not necessary to delve into the propriety of evidentiary orders that would have governed the eventual trial.

evidentiary basis for the court's ruling." *Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶ 18, 499 P.3d 894 (quotation simplified); *see also R4 Constructors LLC v. InBalance Yoga Corp.*, 2020 UT App 169, ¶ 7, 480 P.3d 1075 ("We review a court's decision on extending . . . time . . . for an abuse of discretion, reversing only if there is no reasonable basis for the district court's decision." (quotation simplified)).

¶16    Second, the Childs Parties assert that the district court erred by granting Turley's unopposed motion for summary judgment. In cases involving summary judgment motions that are timely opposed, "we review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Freight Tec*, 2021 UT App 92, ¶ 19 (quotation simplified). Where the motion stands unopposed, the matter is more complicated, and we discuss a district court's duties in this situation, as well as our standard for reviewing a court's exercise of those duties, more fully below in Part II.A.

ANALYSIS

I

¶17    The Childs Parties first argue that the district court abused its discretion when it denied their motion to reset the case deadlines. They complain, in particular, about the court's decision to refuse to consider their belated memorandum in opposition to Turley's summary judgment motion. The court denied the Childs Parties' motion based on its determination that they had not shown excusable neglect. While that determination was perhaps not the only permissible one under the circumstances, we discern no abuse of discretion in the court's decision.

¶18    The Childs Parties' motion was grounded in rule 6(b)(1)(B) of the Utah Rules of Civil Procedure, which permits a court to extend case deadlines "if the party failed to act because of excusable neglect." Our supreme court has described "excusable

neglect" as "an admittedly neglectful delay that is nevertheless excused by special circumstances." *See Reisbeck v. HCA Health Services of Utah, Inc.*, 2000 UT 48, ¶ 13, 2 P.3d 447 (quotation simplified). Utah appellate courts have listed four factors that are often considered when examining a party's claim that it missed a deadline due to excusable neglect: "(1) whether [the moving party] acted in good faith; (2) the danger of prejudice to the non-moving party; (3) the reason for [the moving party's] delay; and (4) the length of the delay and its potential impact on judicial proceedings." *Stoddard v. Smith*, 2001 UT 47, ¶ 24, 27 P.3d 546. But this list of factors is not intended to be exclusive or exhaustive. *See West v. Grand County*, 942 P.2d 337, 340–41 (Utah 1997) (stating that the four factors are "relevant to a determination of excusable neglect," but that they are "not dispositive"); *see also Jones v. Layton/Okland*, 2009 UT 39, ¶ 18, 214 P.3d 859 (stating that "there is no specific legal test for excusable neglect," and that "no one factor or set of factors [is] necessarily dispositive"). Indeed, "the question of whether [a party's] conduct is excusable is an equitable one, and such a determination should take into account all relevant circumstances surrounding the party's neglect." *West*, 942 P.2d at 340; *see also Jones*, 2009 UT 39, ¶ 25 (stating that, in making an excusable neglect determination, "the district court is free to consider all relevant factors and give each factor the weight that it determines it deserves"). "[T]he ultimate goal of the excusable neglect inquiry" is to determine "whether the moving party has been sufficiently diligent that the consequences of its neglect may be equitably excused." *Jones*, 2009 UT 39, ¶ 20.

¶19   In this case, the district court considered all four of the factors enumerated above, and concluded that two of them—prejudice and the length of the delay—weighed only slightly, if at all, against the Childs Parties. The court concluded that only "modest prejudice" and a short delay had resulted from the Childs Parties' lack of diligence. After all, Turley had been able to file a provisional reply memorandum responding to the Childs Parties' belated opposition brief.

¶20 But the court concluded that the other two factors—whether the Childs Parties acted in good faith, and the reason for their delay—weighed heavily in favor of denying the Childs Parties' motion. With regard to the "good faith" factor, the court found that not only had the Childs Parties failed to exhibit good faith, they had acted in affirmative bad faith. Most relevant to the court's analysis was the Childs Parties' demonstrated "pattern" of making bankruptcy filings on the eve of important court hearings, and then dismissing those filings later before they reached a conclusion. The court acknowledged that the Childs Parties "dispute[d] the inference that their bankruptcy filings were made in bad faith," but noted that they "offer[ed] little in the way of any other explanation."

¶21 With regard to the reason for their delay, the Childs Parties' only offered excuse was that they were proceeding pro se, but the court noted that they were savvy enough to figure out how to file strategically timed bankruptcy petitions on their own. Indeed, as the court saw it, the Childs Parties' "professed misunderstanding [was] undermined by their experience in filing petitions for bankruptcy, and the suspect timing of those prior filings." The court also noted that pro se defendants, even though they are "entitled to every consideration that may reasonably be indulged," are expected to comply with the same rules as other litigants. *See Allen v. Friel*, 2008 UT 56, ¶ 11, 194 P.3d 903 (also stating that pro se litigants are "held to the same standard of knowledge and practice as any qualified member of the bar" (quotation simplified)). In the end, the court concluded that "the simplest explanation for the delay in this case is bad faith on the part of" the Childs Parties. The court also found that the Childs Parties' "excuses simply lack credibility," and that their bankruptcy filings were "a tactic" that they employed, "with some success," to strategically delay judicial proceedings.

¶22 In discussing these two factors, the court determined that the Childs Parties had "demonstrated no diligence" at all in responding to the motion, instead making a conscious choice

to rely on Trudy Childs's bankruptcy petition to stay the proceedings. Our supreme court has noted that, "while a party need not be perfectly diligent in order to obtain relief" due to excusable neglect, "*some* diligence is necessary," and that a grant of "relief on the ground of excusable neglect where a party has exercised no diligence at all . . . subverts the purpose of the excusable neglect inquiry." *See Jones*, 2009 UT 39, ¶ 23. And we have affirmed the denial of a motion claiming excusable neglect where a party made a "conscious choice" not to file a timely pleading. *See Somer v. Somer*, 2020 UT App 93, ¶ 23, 467 P.3d 924.

¶23    Thus, although two of the four factors did not cut sharply in favor of either party, the other two weighed heavily in favor of denying the Childs Parties' motion. The court appropriately examined "all relevant circumstances surrounding the [parties'] neglect," *see West*, 942 P.2d at 340, and ultimately determined that the Childs Parties had not "been sufficiently diligent that the consequences of [their] neglect may be equitably excused," *see Jones*, 2009 UT 39, ¶ 20. Under the circumstances presented here, we discern no abuse of discretion in the court's analysis, and on that basis reject the Childs Parties' challenge to the court's denial of their motion to extend deadlines.

II

¶24    Our determination that the district court did not abuse its discretion in denying the Childs Parties' motion to extend timing deadlines means that the court did not err by treating Turley's summary judgment motion as unopposed. Nevertheless, the Childs Parties challenge the court's decision to grant Turley's unopposed motion. We begin our analysis with a general discussion of the scope of a district court's duties when considering an unopposed summary judgment motion, and the scope of our duties in reviewing a court's grant of such a motion. We then consider whether the district court acted appropriately under the circumstances of this case.

A

¶25    In many situations, a district court has discretion to grant a motion merely because the nonmovant fails to oppose it. *See* 56 Am. Jur. 2d *Motions, Rules, & Orders* § 28 (2022) (stating that courts "may construe" a party's "failure to respond" to a motion "as nonopposition" or as "an admission that the motion was meritorious," and that a party's failure to respond to a motion can be taken as an indication that the "party has waived any objection" to the motion). But in some contexts, courts are not permitted to grant a motion on the sole basis that the motion stands unopposed. The summary judgment context falls within this category. *See Tronson v. Eagar*, 2019 UT App 212, ¶ 17, 457 P.3d 407 (stating that "summary judgment may not be entered against the nonmoving party merely by virtue of a failure to oppose" the motion (quotation simplified)).

¶26    Under our rules of civil procedure, summary judgment may be granted "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). When a nonmovant fails to respond to a summary judgment motion, "[e]ach material fact set forth in the motion . . . is deemed admitted for the purposes of the motion." *Id.* R. 56(a)(4). In that situation, courts must accept as true all of the facts set forth and supported in the movant's papers, and in this way courts "depart from [their] usual [summary judgment] posture of construing all facts in favor of the non-moving party." *See Smith ex rel. Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997) (quotation simplified). Indeed, courts "refuse to consider any facts contradicting" the admitted facts set forth and supported in the movant's papers. *See id.* Nevertheless, courts in this situation must still view "all reasonable inferences drawn" from those admitted facts "in the light most favorable to the non-moving party." *Id.*

¶27    But even in cases in which a summary judgment motion stands unopposed, a nonmovant's failure to respond to the

motion does not, by itself, entitle the movant to relief; indeed, the applicable rule makes clear that a district court may grant a summary judgment motion only "if the motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to" judgment as a matter of law. *See* Utah R. Civ. P. 56(e)(3); *see also Tronson*, 2019 UT App 212, ¶ 17. Thus, even where a summary judgment motion stands unopposed, a district court is still obligated to examine the filed motion, and must still "determine whether the moving party's pleadings, discovery, and affidavits demonstrate its entitlement to judgment as a matter of law." *Tronson*, 2019 UT App 212, ¶ 17 (quotation simplified); *see also Gardiner v. Anderson*, 2018 UT App 167, ¶ 8 n.5, 436 P.3d 237 ("Even in situations where a motion for summary judgment is unopposed, the moving party bears the burden of showing that it is entitled to summary judgment as a matter of law by demonstrating it is entitled to the remedy it seeks either under a contract or law."). And "[w]here the moving party would bear the burden of proof at trial, the movant must establish each element of his claim in order to show that he is entitled to judgment as a matter of law." *Orvis v. Johnson*, 2008 UT 2, ¶ 10, 177 P.3d 600; *see also id.* ¶¶ 18–19 (discussing the different summary judgment burdens parties carry, depending on whether the movant or the nonmovant bears the burden of proof at trial).

¶28 A district court's inquiry in the context of an unopposed summary judgment motion is not intended to be particularly searching. Certainly, a district court must review the moving papers, and may not grant the motion without conducting such a review simply because the motion is unopposed. But if, after reviewing the unopposed motion, it appears to the court that the movant has connected the relevant dots—that is, that the moving papers recite supported facts which, taken as true, appear to entitle the movant to relief under applicable law—then the motion should be granted. *See Tronson*, 2019 UT App 212, ¶¶ 20–21 (noting that the movant's motion included "sworn affidavits" as well as copies of the relevant contracts, and concluding that "[a]ny judge reviewing the unopposed motion and its seven exhibits

would have been satisfied that [the movant] was entitled to judgment as a matter of law"). On the other hand, if after review of the moving papers it is not apparent to the court that the movant is entitled to judgment as a matter of law, the motion should be denied, despite its unopposed status. *See, e.g.*, *Smith v. Kirkland*, 2017 UT App 16, ¶¶ 14–31, 392 P.3d 847 (reversing a district court's grant of an unopposed summary judgment motion where the motion was supported only by inadmissible evidence and where "the deficiencies of the [motion] . . . were apparent on its face"); *Pepperwood Homeowners Ass'n v. Mitchell*, 2015 UT App 137, ¶ 7, 351 P.3d 844 (reversing a district court's grant of an unopposed summary judgment motion where the movant failed to attach or include a copy of the operative contract, and therefore had "failed to produce evidence of an underlying contract or covenant that would entitle it to judgment as a matter of law").

¶29 In *Tronson*, we stated that "a nonmovant who fails to oppose a summary judgment motion has thereby failed to preserve any objection to the district court's entry of summary judgment against it, and that, on appeal, any challenge to the district court's entry of an unopposed summary judgment motion would be reviewed only for plain error." 2019 UT App 212, ¶ 18. But since *Tronson*, we have determined that plain error review is unavailable in most civil cases. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 44, 507 P.3d 357 (holding that "plain error review is not available in ordinary civil cases unless expressly authorized by rule"). We must therefore reconsider how and under what standard we review appellate challenges to a district court's grant of an unopposed summary judgment motion. We conclude that we must review for correctness the question of whether the movant's papers, on their face, indicate that the movant is entitled to judgment as a matter of law. That is, we must satisfy ourselves—just as district courts must—that the requirements of rule 56 are met on the face of the moving papers. But absent extraordinary circumstances, that is the end of our inquiry, and any defenses or counter-arguments that the nonmovant might have raised in a never-filed opposition

memorandum are unpreserved and cannot be raised or considered on appeal.

¶30    A nonmovant is therefore entitled to challenge, on appeal, whether the district court correctly determined, after examination of the movant's papers, that the movant's "motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to" judgment as a matter of law. *See* Utah R. Civ. P. 56(e)(3). And a district court's determination as to whether a movant is entitled to judgment as a matter of law is always reviewed for correctness. *See Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶ 19, 499 P.3d 894. We see no reason to depart from this established standard of review merely because the motion in question went unopposed.

¶31    But in this context, our review is limited—as the district court's examination was—to consideration of what appears on the face of the movant's motion and accompanying papers. Our inquiry is exactly the same as the district court's: does it appear, from the unopposed facts set forth in the motion and from the exhibits and attachments to the motion (as contained in the appellate record), that the movant is entitled to judgment as a matter of law? In other words, if the unopposed facts are true—as must be assumed—does the law as applied to those facts entitle the movant to prevail? We will affirm if we can answer that question in the affirmative.

¶32    One thing we will not do—absent extraordinary circumstances—is consider a nonmovant's defenses, counter-arguments, or legal theories that could have been raised in a never-filed memorandum in opposition to the motion. Neither the district court nor this court is an advocate for either side, and neither is obligated to scour the record to come up with arguments or theories that the nonmoving party had an opportunity to raise but did not. Such theories were, by definition, not presented to the district court and are therefore not preserved

for appellate review. As noted, prior to *Kelly* we allowed parties to raise "any challenge" to a district court's entry of an unopposed summary judgment motion on appeal, but reviewed such challenges under the plain error standard. *See Tronson*, 2019 UT App 212, ¶ 18. But plain error review is no longer available in most civil cases. *See Kelly*, 2022 UT App 23, ¶ 44. There are only three exceptions to our preservation requirements: "plain error, ineffective assistance of counsel, and exceptional circumstances." *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443. The first two of those exceptions are now not ordinarily available to civil litigants, leaving "exceptional circumstances" as the sole available exception to our preservation requirements. Thus, absent a showing by an appellant that exceptional circumstances compel examination of unpreserved legal theories that could have been raised in opposition to a summary judgment motion, such theories may not be raised or considered on appeal.

B

¶33　With these principles in mind, we turn to the Childs Parties' specific challenges to the district court's entry of summary judgment in favor of Turley. We note at the outset that Turley sought summary judgment on claims for which he bore the burden of proof at trial: claims for declaratory judgment that the Agreement was valid and enforceable, and for an order commanding the Childs Parties to specifically perform thereunder. Thus, to obtain summary judgment, Turley was required to "establish each element of his claim in order to show that he is entitled to judgment as a matter of law," and to do so Turley needed to "provide the court with facts that demonstrate both that [he] is entitled to judgment as a matter of law and that there are no material issues of fact that would require resolution at trial." *See Orvis v. Johnson*, 2008 UT 2, ¶¶ 10, 19, 177 P.3d 600. Accordingly, just as the district court did, we must examine Turley's moving papers and determine whether, on the face of those papers and in light of those standards, Turley appears entitled to summary judgment.

¶34 As noted above, Turley's motion is lengthy and well-supported. It comprises over 500 pages of the appellate record. The motion itself is twenty-six pages long, and comes accompanied by twenty-five exhibits, some of which also include a number of attachments. Among the exhibits and attachments are both the unsigned handwritten memorandum and the transcript of the trial proceedings at which the parties recited the terms of the Agreement. The attachments also include Appraiser 1's full report as well as sworn affidavits from Turley and several other witnesses setting forth and supporting the relevant facts: that the Childs Parties marketed the Property for eight months and received no offers; that Appraiser 1—after being selected by the two appraisers chosen by the parties—valued the Property at $1.618 million; and that Turley tendered that amount by cashier's check to the Childs Parties. We have reviewed the motion and its attachments, and we agree with the district court that the motion, on its face, contains enough information, analysis, and admissible supporting evidence to satisfy Turley's summary judgment burden on his claims for declaratory judgment and specific performance.

¶35 The Childs Parties resist this conclusion on three grounds, none of which we find persuasive. First, they assert that the Agreement is not complete or definite enough to be enforceable, and that the parties—by informing the court that they intended to formalize the Agreement—"did not intend to be bound until their preliminary agreement was reduced to writing." We disagree, because under the unopposed facts set forth in Turley's motion, the Agreement was not intended to be preliminary, and it is definite enough to be enforceable.

¶36 "Settlement agreements are governed by the rules applied to general contract actions," and "a contract may be enforced even though some contract terms may be missing or left open to be agreed upon." *Patterson v. Knight*, 2017 UT App 22, ¶ 6, 391 P.3d 1075 (quotation simplified). In particular, it is common for parties to reach an enforceable oral agreement and still want to

memorialize it more formally in writing; in such a situation, the oral agreement is not unenforceable simply because the parties envisioned a more formal writing being signed later. *See Badger v. MacGillivray*, 2016 UT App 109, ¶ 2, 374 P.3d 1053 (per curiam) ("If a written agreement is intended to memorialize an oral contract, a subsequent failure to execute the written document does not nullify the oral contract." (quotation simplified)). What matters is whether the oral agreement, as articulated and understood, is sufficiently definite to be enforceable. *See Park Prop. Mgmt. LLC v. G6 Hosp. Franchising LLC*, 2022 UT App 75, ¶ 24 (stating that settlement agreements are enforceable "even though some contract terms may be missing or left open to be agreed upon, so long as the essential terms are not so uncertain that there would be no basis for deciding whether the agreement had been kept or broken" (quotation simplified)); *see also Patterson*, 2017 UT App 22, ¶ 6 (stating that only when the "essential terms" of an oral settlement agreement "are so uncertain that there is no basis for deciding whether the agreement has been kept or broken" will we conclude that "there is no contract").

¶37   In this case, the summary judgment papers indicate that the Agreement—as expressed in the handwritten memorandum and in the trial transcript—was intended to be binding, despite the parties' intention to more formally memorialize it. The parties did not use words like "preliminary" or "contingent" in describing the Agreement. In the moment, both sides appeared to believe that the Agreement was binding, with the Childs Parties' attorney confirming to the court that the recited terms constituted "our agreement." Notably, the Childs Parties later stated, in a court filing, that they would be "happy to sign a printed copy of the [trial] transcript together with [the unsigned handwritten memorandum] as the *final* agreement." (Emphasis added.) Moreover, the parties thereafter acted as though the Agreement was in force, by marketing the Property and choosing appraisers.

¶38   And the Agreement, as set forth in the handwritten memorandum and as described by the parties in the trial

transcript, is sufficiently definite to be enforceable. Under that Agreement, the Childs Parties were to market the Property generally for eight months, and would "grant to [Turley] a right of first refusal to purchase" the entire Property; that right of first refusal was to exist for the entirety of the eight-month marketing period. During that period, the Childs Parties were to "give [Turley] 60 days notice of any bona fide offer," and it was "understood that if an offer came in on the last day of the eight-month period [the parties] would still have 60 days to effectuate" a closing. "At the end of eight months if the [P]roperty ha[d] not been sold or [was] not under contract to be sold," Turley could "purchase [the Property] . . . at an appraised amount." If the parties did not "agree on the appraisal that [came] forward," then each side would "identify an appraiser" and "[t]hose two appraisers [would] then identify a third appraiser" whose valuation would serve as "the appraised value" that Turley would "pay in order to purchase [the Property]." The appraisal was to "comply with the federal standards, which are commonly referred to as yellow book standards."

¶39 We agree with the district court's assessment of the Agreement. The court determined that the Agreement "includes the necessary basic terms, including the identification of the parties" to the Agreement, "identification of the Property at issue," the "formulation of a sale price, and a general timeline for arriving at a final sale of the Property." While a more formal memorialization of this Agreement might have been more specific or included additional related items, we agree with the district court that the Agreement—as described in Turley's unopposed motion—contained the necessary basic terms and was sufficiently definite to be enforceable.[5] *See Patterson*, 2017 UT App 22, ¶ 8.

---

5. In arguing to the contrary, the Childs Parties rely heavily on *Lebrecht v. Deep Blue Pools & Spas Inc.*, 2016 UT App 110, 374 P.3d 1064. But that case is distinguishable from this one. First, the

(continued…)

¶40 Second, the Childs Parties assert that Turley did not present evidence sufficient to demonstrate that he exercised his option in a timely manner. While the Agreement contained certain time limits that were to apply in the event that Turley opted to match an offer made by a third party during the marketing period, the Agreement did not set forth particular time limits that would govern if no third-party offer was made and if the parties ended up having to obtain an appraisal. Both parties agree that a "reasonable time" limitation should be implied. *See Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 858 (Utah 1998) (holding that in Utah "the settled rule is that if a contract fails to specify a time of performance the law implies that it shall be done within a reasonable time under the circumstances"). The Childs Parties assert that Turley's motion did not provide sufficient evidence that Turley acted within a reasonable time. We disagree.

¶41 Turley's motion recites that no third-party offer was received during the marketing period, and that thereafter both sides selected appraisers as specified by the Agreement. The facts as recited by Turley do discuss some delays in the process after that, but—as described by Turley—those delays were the fault of the Childs Parties due to their objection to Appraiser 1 and their refusal to sign an engagement letter agreeing to pay Appraiser 2. In the end, Turley asserts, with evidentiary support, that he tendered the appraised amount within one week of receiving Appraiser 1's report. These facts, when deemed undisputed (as

_____

"Term Sheet" at issue in *Lebrecht* was not intended to be binding, with one side having expressly reserved the right to "review it with legal counsel" before committing to its terms. *Id.* ¶ 19. As discussed above, the summary judgment papers indicate that the Agreement in this case was intended to be binding. Second, the "Term Sheet" in *Lebrecht* was less definite than the Agreement here. "It consist[ed] of several bullet-point terms and phrases that, without the assistance of extrinsic evidence, [were] vague or unclear," and it lacked basic identifying information, "including for which party each term applie[d]." *Id.* ¶ 15.

they must be given the Childs Parties' failure to oppose the motion), are sufficient to demonstrate that Turley acted within a reasonable time frame.

¶42 Any arguments to the contrary are precisely the sort of thing that needed to have been raised in a timely opposition to Turley's motion. If the Childs Parties wished to take issue with the reasonableness of Turley's timing, they needed to oppose Turley's motion by arguing that the timing was, in fact, not reasonable or by providing affidavits or other evidentiary support tending to show that Turley had been dilatory and that any delays were not their fault. *See id.* (stating that "what is a reasonable time under the circumstances . . . is a factual determination"). But because Turley's motion went unopposed, we accept the undisputed facts as recited in his motion. *See* Utah R. Civ. P. 56(a)(4). In this situation, neither the district court nor this court is under any obligation to scour the record to look for evidence to contradict Turley's contentions. And though Turley's motion never specifically recited that he exercised his option in a timely fashion, he did assert that he had done "all that was required of him under the terms of the Agreement," a contention which necessarily includes the timely exercise of his option. We must take that fact as true for purposes of our analysis, and there is no reasonable inference that we could draw from that fact that would be of assistance to the Childs Parties. Any theory to the contrary falls squarely within the category of arguments that are waived upon failure to respond to a motion for summary judgment.

¶43 Finally, the Childs Parties assert that Turley did not present evidence demonstrating that Appraiser 1's report met federal "yellow book" standards. The Childs Parties correctly note that this was a specific term of the Agreement, as recited to the court during trial in the First Lawsuit. But under the circumstances presented here, the Childs Parties' contention that this term was not complied with also falls within the category of things that are waived by not opposing a summary judgment motion. As noted, Turley asserted that he had done "all that was required of him

under the terms of the Agreement," a contention that would include providing a proper appraisal. And more specifically, within Appraiser 1's report—which is more than 100 pages long—he certified that his analysis was "in conformity with the requirements of the Code of Professional Ethics and Standards," that his report was prepared in conformity with uniform standards, and that he was certified and licensed to perform the appraisal by the State of Utah. This was sufficient: given these assertions, Turley was not obligated to expressly state, in his moving papers, that the appraisal report satisfied "yellow book" standards. If the Childs Parties believed that some aspect of Appraiser 1's work did not meet those standards, they had an opportunity to point that out, and to support any such contention with evidence, in an opposition memorandum.[6] They did not avail themselves of that opportunity. That contention is now waived, and will not be considered for the first time on appeal.

¶44　In short, we perceive no error in the district court's analysis of Turley's unopposed summary judgment motion. As far as we can tell, the court carefully examined that motion; indeed, it engaged in a five-page analysis of whether the undisputed facts set forth in Turley's motion, viewed in light of applicable law, entitled him to summary judgment. We have engaged in the same examination, and we reach the same conclusion.

CONCLUSION

¶45　The district court did not abuse its discretion by denying the Childs Parties' motion to extend the case deadlines, and therefore the district court did not act inappropriately in treating Turley's summary judgment motion as unopposed. And the court did not err in determining that Turley's unopposed motion, along

---

6. Even on appeal, the Childs Parties do not actually identify any aspect of Appraiser 1's report that was noncompliant with "yellow book" standards.

with its voluminous attachments, demonstrated that Turley was entitled to judgment as a matter of law.

¶46    Affirmed.

————————