2025 UT App 41

# THE UTAH COURT OF APPEALS

DAVID L. FREESTONE AND JANET FREESTONE,
Appellants,
*v.*
COREY WALTON AND HEATHER N. WALTON,
Appellees.

Opinion
No. 20230618-CA
Filed March 20, 2025

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 190906779

Brett D. Cragun, Attorney for Appellants

Russell A. Cline, Attorney for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1      David L. Freestone and Janet Freestone (the Freestones) share a backyard boundary with their neighbors Corey Walton and Heather N. Walton (the Waltons). The Freestones claim that, due to application of the doctrine of boundary by agreement, the boundary between their respective parcels is different from what is depicted on property records. The district court dismissed the Freestones' boundary-by-agreement claim on summary judgment, and the Freestones appeal that decision. We affirm.

BACKGROUND[1]

¶2    The Freestones purchased their property (the Freestone Property) in 2008. At the time, the adjacent property (the Walton Property) was owned by another family (the Walton Predecessors), who had already installed a sprinkler system and landscaping along what they thought was the eastern boundary of their property. The contractor who installed the sprinkler system marked what he thought was the property line in spray paint, and he told the Walton Predecessors that "this is where [the boundary] is"; the Walton Predecessors "said okay" and proceeded to have the contractor install the sprinklers and the landscaping up to those markers and no further. They did not, however, obtain a survey of their property or consult their record title to verify the correct location of the eastern boundary of their property; they merely relied on the contractor's designation of the property line and came to believe that this line represented the true boundary.

¶3    When the Freestones acquired their property in 2008, the area between the houses was open; no fence separated the two properties. And like the Walton Predecessors, the Freestones also assumed, and came to believe, that the sprinkler/landscaping line established by the Walton Predecessors represented the boundary between the respective parcels. Based on this understanding, the Freestones made certain improvements—including an expanded playground area and an extension of their driveway—in what they considered to be their backyard. But the Freestones likewise did not obtain a survey or consult their record title in an effort to ascertain where the true property boundary was.

---

1. In reviewing a grant of summary judgment, "we recite the facts in the light most favorable to the non-moving party." *Burton v. Chen*, 2023 UT 14, ¶ 5 n.2, 532 P.3d 1005 (cleaned up).

¶4    A few years later, in 2012, the Freestones began to make plans to install a fence between their property and the Walton Property, and they informed the Walton Predecessors of their plans. In particular, the Freestones discussed with the Walton Predecessors the type, color, and cost of the fence, and suggested that the fence be located along the landscaping line that had previously been established. The Walton Predecessors did not agree to contribute to the cost of the fence, but they made no objection to the Freestones' plans to build the fence, at their own expense, in the manner and at the location described. Thereafter, the Freestones proceeded to install the fence along the landscaping line; before doing so, they did not obtain a survey or take other action intended to ascertain the true location of the boundary. And for the next few years, no party raised any issue about the location of the fence or the boundary more generally.

¶5    In 2017, the Waltons acquired the Walton Property. A couple of years later, the Freestones investigated the possibility of "building a shop" in the yard behind their house; during the course of this process, the Freestones discovered that the fence they had built in 2012 had not been installed along the property line. The fence's northern starting point is apparently more or less in the right place, but the fence angles too far to the west onto the Walton Property, resulting in a wedge-shaped discrepancy between the fence line and the true property line; at the southern end of the properties, the gap between the fence line and the property line is more than thirty feet. This wedge-shaped part of the Walton Property is herein referred to as "the Disputed Strip."[2]

---

2. At one point during the summary judgment briefing in the district court, the Freestones asserted that there "is a potential question of fact as to the location of the" actual record boundary line. They claimed that "a search of the Weber County land records shows that the [fence line] and [boundary of record] are one and the same." We do not purport to resolve any such dispute

(continued…)

When the Freestones approached the Waltons about the boundary issue, a dispute arose regarding ownership of the Disputed Strip.

¶6    In 2019, the Freestones filed suit, asserting a single cause of action in which they sought to quiet title to the Disputed Strip pursuant to the doctrine of boundary by agreement. The Freestones asserted that they and the Walton Predecessors had "entered into an agreement" as to the location of the fence, and claimed that they would incur "tens of thousands of dollars of damage" if they were required to remove the fence and the parts of their backyard improvements that involve the Disputed Strip.

¶7    During discovery, the Freestones took the deposition of Terri,[3] one of the Walton Predecessors. In her deposition, Terri testified about putting in the sprinkler system and landscaping. She indicated that she had no independent knowledge of exactly where the eastern boundary of her property was, and that she simply followed—and "agreed with"—the spray-painted markings placed by the contractor who installed the sprinkler system. She explained that "[t]he guy that [installed the system] came out and spray-painted [a line] and said, 'this is where [the boundary line] is.'" Terri further testified that she "didn't verify" the accuracy of the contractor's markings; rather, she "just let it go." When asked specifically if there was ever an express agreement between the Walton Predecessors and the Freestones "as to the location of the fence," Terri unequivocally answered "no." Indeed, at no point during her deposition did Terri indicate

---

here, and we assume—for purposes of our analysis and without deciding—that the fence was *not* installed in the correct location. Indeed, if the fence line and the true boundary line are in fact one and the same, the Freestones would not need to assert boundary by agreement, because their claim of ownership of the Disputed Strip would be supported by the record title.

3. A pseudonym.

that she ever entered into any specific agreement to establish the fence line as the true boundary between the properties, or even that she ever knew that the fence had been installed in the wrong place. To the contrary, Terri repeatedly testified that she had merely "assumed that [the fence] was on [the] property line[]" and that she had no independent knowledge of where the actual property line was.

¶8 Based largely on Terri's deposition testimony, the Waltons filed a motion for summary judgment, asserting that the Freestones' boundary-by-agreement claim should be dismissed as a matter of law because no agreement had ever been reached as to the location of the boundary. The Freestones opposed the motion, arguing that the fence line had been "established" as the boundary by the Walton Predecessors, that it was the "accepted boundary line" between the properties, and that the Walton Predecessors had "never disputed the location of the fence" or taken the position that the fence line did not represent the actual property boundary.

¶9 In support of their opposition, the Freestones submitted a sworn declaration from David Freestone. In that declaration, David acknowledged that he had not had the property surveyed before building the fence, but he stated that the Freestones and the Walton Predecessors had "recognized the [fence line] as the boundary line between the parties' lots," and he averred that "[t]his realization was in place years before the fence was built," as evidenced by the Walton Predecessors' installation of sprinklers and landscaping. Indeed, he stated that, in 2012, he "discussed with [the Walton Predecessors] building a fence along" the landscaping line, and he asserted that the two families "had agreed previously that the [landscaping line] was the property boundary." David emphasized that, when the Freestones discussed with Terri their plan to build a fence, "it was clear the fence would be place[d] along the boundary line that was

originally established by the [Walton Predecessors] and which had been agreed to."

¶10　After full briefing, the district court heard argument. The court focused its questions on whether the Walton Predecessors' conduct constituted mere *acquiescence* to a boundary line rather than an explicit *agreement* resolving a dispute about the location of the boundary. The court observed that there had "been nothing explicit" from Terri, that she "just assumed" that the contractor's painted markers represented the boundary line, and that "[t]hat seems [like] an acquiescence rather than an agreement." When pressed on this point, the Freestones argued that they discussed the fence with Terri, that all parties "recognize[d] the [fence line] is the boundary line between the parties' lots," and that the Walton Predecessors "did not object to the color of the fence or to it being placed along" the landscaping line.

¶11　At the conclusion of the hearing, the court made an oral ruling granting the Waltons' motion for summary judgment. The court expressed concern that the Freestones were "conflating boundary by acquiescence with boundary by agreement," and it concluded that—while there was some evidence of acquiescence—there was no evidence of an express agreement resolving a dispute about the boundary. The court later memorialized its oral ruling in a written order and entered judgment in favor of the Waltons.

ISSUE AND STANDARD OF REVIEW

¶12　The Freestones now appeal, asserting that the district court erred by granting the Waltons' motion for summary judgment. Specifically, the Freestones argue that a genuine issue of material fact exists as to whether the Freestones and the Walton Predecessors entered into an agreement to establish the fence line as the boundary between the properties. "We review a district court's grant of summary judgment for correctness and afford no

deference to the court's legal conclusions." *Turley v. Childs*, 2022 UT App 85, ¶ 16, 515 P.3d 942 (cleaned up).

ANALYSIS

¶13    We begin our analysis by discussing two related common-law doctrines that each provide a pathway for litigants to quiet title in property along lines different from those described in title documents: boundary by agreement and boundary by acquiescence. *See Bahr v. Imus*, 2011 UT 19, ¶¶ 35–56, 250 P.3d 56. There is a "close conceptual relationship between" the two doctrines, "both of which apply to boundary disputes and look for acquiescence or agreement by adjoining landowners." *Anderson v. Fautin*, 2016 UT 22, ¶ 13, 379 P.3d 1186. But the doctrines serve different purposes and have different elements, and courts must take care not to inappropriately conflate these two doctrines. *See id.* ¶¶ 8–13; *see also Bahr*, 2011 UT 19, ¶ 19 (noting that the theories each "fill[] a distinct niche in the law").

¶14    For purposes of our analysis, these two boundary dispute doctrines diverge in two key respects. First, boundary by agreement requires a claimant to "marshal evidence of an express parol agreement," whereas boundary by acquiescence "addresses those cases where there is no evidence of an express agreement." *Anderson*, 2016 UT 22, ¶ 28. In this vein, while boundary by agreement requires an explicit agreement between the landowners, boundary by acquiescence can be supported with "[a]n *inference* of an agreement based on mere acts or omissions of the parties." *Bahr*, 2011 UT 19, ¶ 42 (emphasis added).

¶15    The second key difference relates to time: a boundary by agreement creates an enforceable boundary "without respect to the length of time in which the parties have embraced it," *id.* ¶ 44, whereas boundary by acquiescence requires that a boundary have been recognized for at least twenty years, *Anderson*, 2016 UT 22, ¶ 31; *see also Bahr*, 2011 UT 19, ¶ 45 (repudiating a showing of

some passage of time as a requirement for boundary by agreement, and explaining that "[a] requirement of a long period of acquiescence does not comport with the policy of repose upon which boundary by agreement is premised because it creates continued uncertainty even following an express agreement between adjoining landowners regarding the location of the boundary between their properties"). Our supreme court has linked the time requirement of a boundary-by-acquiescence claim to the evidentiary burden of a boundary-by-agreement claim, explaining that a party lacking proof of an express parol agreement "will likely be forced to rely instead on the more restrictive doctrine of boundary by acquiescence, with its attendant twenty-year acquiescence requirement." *Bahr*, 2011 UT 19, ¶ 46. As noted already, the Freestones' claim in this case is grounded entirely in the boundary-by-agreement doctrine; they freely acknowledge that they cannot meet the twenty-year requirement of the boundary-by-acquiescence doctrine.[4]

¶16   Against this background, we now analyze the Freestones' boundary-by-agreement claim. To succeed on that claim, a party must show (1) that there was "an agreement between adjoining landowners," (2) that the agreement settled "a boundary that is uncertain or in dispute," (3) "that injury would occur if the boundary were not upheld," and (4) in cases "where the doctrine is being invoked against successors in interest," that there has been a "demarcation of a boundary line such that a reasonable party would be placed on notice that the given line was being treated as the boundary line between the properties." *Id.* ¶ 41.

¶17   Of these elements, we need here analyze only the first two: whether there was an express agreement and whether that

---

4. The Freestones acquired their property and had their first interactions with the Walton Predecessors in 2008, and they installed the fence in 2012. Twenty years have not yet elapsed since any of those events took place.

agreement served to settle a dispute or uncertainty about the location of the true boundary. The district court's analysis turned largely on the first element—the presence or absence of an express agreement between the Freestones and the Walton Predecessors. But the facts of this case require these first two elements to be analyzed together,[5] and our analysis leads us to the conclusion that, to the extent that there was an agreement between the Freestones and the Walton Predecessors, any such agreement did not serve to resolve an uncertainty or settle a dispute about the location of the boundary line.

¶18    "The first element of boundary by agreement requires that there be an express agreement between adjoining landowners." *Id.* ¶ 42 (cleaned up). That is, the agreement must be "an actual, express statement of agreement between the parties." *Id.* "This agreement may be oral, but it must be explicit." *Id.* (cleaned up). To determine whether there has been an agreement that meets the

---

5. The concepts described by the first two elements of boundary by agreement—at least as our supreme court has articulated those elements—are often difficult to analytically separate. The first element requires the existence of an agreement, and the second element involves an examination of the subject matter of that agreement and requires that the agreement in question "settl[e] a boundary that is uncertain or in dispute." *Bahr v. Imus*, 2011 UT 19, ¶ 41, 250 P.3d 56. Indeed, given the close analytical relationship between these concepts, courts in some jurisdictions have combined them into one element. *See, e.g., Ross v. DeLorenzo*, 672 P.2d 1338, 1341 (Or. Ct. App. 1983) (reciting as one element that "the uncertainty must be resolved by an agreement, express or implied, to recognize a particular line as the boundary"); *Piotrowski v. Parks*, 691 P.2d 591, 593 (Wash. Ct. App. 1984) (reciting as one element that "the owners must arrive at an express meeting of the minds to permanently resolve the dispute or uncertainty by recognizing a definite and specific line as the true and unconditional location of the boundary" (cleaned up)).

requirements of the boundary-by-agreement doctrine, we rely on established contract principles, including whether there has been a meeting of the minds between the parties and whether the agreement is supported by consideration. *See Anderson*, 2016 UT 22, ¶¶ 15, 18 (observing that boundary by agreement is rooted in contract principles); *Staker v. Ainsworth*, 785 P.2d 417, 423 n.4 (Utah 1990) (noting that boundary by agreement is "premised on a contractual theory"); *see also Wood v. Bapp*, 169 N.W. 518, 522 (S.D. 1918) ("Like every other contract, an agreement fixing a boundary line must be based upon a sufficient consideration or else it is not binding."); *Piotrowski v. Parks*, 691 P.2d 591, 593 (Wash. Ct. App. 1984) (explaining that a boundary-by-agreement claim requires "an express meeting of the minds to permanently resolve the dispute or uncertainty by recognizing a definite and specific line as the true and unconditional location of the boundary" (cleaned up)); 82 Am. Jur. 3d *Proof of Facts* § 7 (2024) ("Parol agreements establishing a boundary must be supported by consideration. Where there is a bona fide dispute as to the true location of a boundary, or its location is not definitely known, a sufficient consideration exists for the making of an agreed line.").

¶19     The second element of boundary by agreement goes to the subject matter of the agreement, and it requires the proponent of the doctrine to demonstrate that the agreement in question "settl[ed] a boundary that is uncertain or in dispute." *Bahr*, 2011 UT 19, ¶ 41. This "second element of boundary by agreement—uncertainty or dispute about the location of a boundary—is necessary to satisfy the statute of frauds," at least in situations where the contract in question isn't written. *Id.* ¶ 47; *see also* 12 Am. Jur. 2d *Boundaries* § 71 (2025) ("The doctrine of an agreed boundary line . . . rests fundamentally upon the fact that there is, or is believed by all parties to be, an uncertainty as to the location of the true line. The dispute must precede the parole agreement; a dispute at the time of the litigation is irrelevant."). "Without this element, an oral agreement setting a boundary would effect an impermissible transfer of the land instead of a permissible

location of the existing estate." *Bahr*, 2011 UT 19, ¶ 47 (cleaned up). "This uncertainty requirement mandates that a party seeking to rely on boundary by agreement must show that she was uncertain of the true location of the boundary between her property and her neighbor's property." *Id.* ¶ 48. If satisfied, the uncertainty or dispute element of the claim will often also provide the consideration that supports an express agreement; indeed, courts have recognized that these two concepts are closely linked. *See Ross v. DeLorenzo*, 672 P.2d 1338, 1341 (Or. Ct. App. 1983) ("The element of resolution of uncertainty may also provide the consideration for the agreement." (cleaned up)); 12 Am. Jur. 2d *Boundaries* § 73 (2025) ("Parol agreements establishing a boundary must, the same as other contracts, be supported by consideration, but the mutual concessions of the parties in order to determine a doubt or uncertainty existing with reference to a boundary line or terminate the dispute in regard thereto have been generally regarded as sufficient." (cleaned up)).

¶20   In this case, there is perhaps a question of fact about whether the Freestones and the Walton Predecessors entered into some sort of express agreement about the location of the fence. Indeed, David Freestone avers that the two families "had *agreed* previously that the [landscaping line] was the property boundary between" their lots and that the fence would be built on that line. (Emphasis added.) But even assuming—as we must at this procedural stage—that this assertion is true, and that there was some sort of express agreement in place, there exists no evidence that any such agreement served to resolve any dispute or uncertainty between the families about the true location of the boundary line.

¶21   At the time any such "agreement" was reached, both families (mistakenly, as it turns out) believed that the fence line represented the true boundary between their lots. Terri's mistaken belief arose from the sprinkler contractor's errant spray paint markings, and she did not verify the accuracy of those

markings. And when the Freestones moved into the neighborhood a year or two later, they simply assumed that the Walton Predecessors' landscaping and sprinkler system indicated the true boundary and built their home improvements accordingly, without obtaining a survey of the property or searching municipal records to verify the correct location of the boundary. Indeed, in 2012 when the Freestones initiated discussions with Terri about installation of the fence, neither side raised any dispute—or even expressed any confusion—about where the true boundary line was. Both families simply continued to assume that the property line was the landscaping line, and any agreement about the location of the fence was premised on that mutual mistaken assumption.

¶22     In this situation, the Walton Predecessors had no idea that, by entering into an agreement as to the location of the fence, they were giving up any right to ownership of the Disputed Strip. And by the same token, the Freestones had no idea that, by entering into the same agreement, they were enlarging the size of their parcel. No money or other traditional consideration changed hands as part of this agreement. As noted already, the consideration requirement may be met, even if no money changes hands, if the parties have a bona fide dispute or recognized uncertainty about the true location of the boundary line and they mutually agree to resolve that dispute or uncertainty as part of the agreement. *See supra* ¶¶ 18–19. But here, where both parties believed the fence line to be the true boundary line, their agreement cannot have served to resolve any actual dispute or uncertainty about the location of the boundary. Without any dispute or uncertainty over the property line (or any other promise, act, or detriment), there was no bargained-for exchange here—no one consciously gave anything in exchange for something else. And in this situation, where there is no express agreement to resolve any pending dispute or uncertainty about the location of a boundary, the elements of the boundary-by-agreement doctrine are not satisfied.

¶23 Indeed, this case strikes us as a classic example of *acquiescence* rather than *agreement*. Although David Freestone uses the word "agreed" twice in his declaration, he does not use that word to connote a contractual arrangement to resolve an active dispute about the location of the boundary; instead, in context—given the absence of any actual dispute or uncertainty about the boundary's location—he uses the word to mean that Terri *consented* or *acquiesced* to the fence's placement. Elsewhere in his declaration, he explains that the two families "recognized" the landscaping line as the boundary and that the Walton Predecessors "never disputed" the location of the fence and "never complained" about the Freestones' installation of certain backyard improvements. And he readily acknowledges that the Freestones did not survey the property prior to installation of the fence, and he does not claim that—prior to 2017—they were ever under the impression that the true record boundary between the properties was elsewhere. *See Bahr*, 2011 UT 19, ¶ 48 (stating that "a party seeking to rely on boundary by agreement must show that she was uncertain of the true location of the boundary between her property and her neighbor's property").

¶24 This evidence may well give rise to "[a]n *inference* of an agreement." *See id.* ¶ 42 (emphasis added). But it does not constitute evidence of an agreement to resolve a known boundary dispute. And "[a]n inference of an agreement based on mere acts or omissions of the parties is the domain of boundary by acquiescence," not boundary by agreement. *Id.* To keep the two doctrines separate from one another and avoid improperly conflating them, we must conclude that this case simply does not present facts sufficient to constitute boundary by agreement. If we were to relax the first two elements of the boundary-by-agreement doctrine to allow these facts to fit within it, we would conflate the two doctrines and effectively set aside the twenty-year requirement imposed by the boundary-by-acquiescence doctrine. And this we decline to do.

## CONCLUSION

¶25 In this case, while the Freestones presented evidence that could create an inference of acquiescence, they presented no evidence of an agreement that purported to resolve any dispute or uncertainty about the location of a boundary. Thus, they cannot make the showing required by the first two elements of the boundary-by-agreement doctrine. Accordingly, the district court did not err by entering summary judgment in favor of the Waltons.

¶26 Affirmed.[6]

_____

6. The Waltons request an award of attorney fees pursuant to rule 33 of the Utah Rules of Appellate Procedure. We decline to grant this request. Fees are to be awarded under this rule "only in egregious cases, lest there be an improper chilling of the right to appeal erroneous lower court decisions." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 36, 440 P.3d 757 (cleaned up). While we ultimately reject the Freestones' arguments, we do not consider this an "egregious" case worthy of sanctions.